**William ELDRIDGE, Appellant,**

v.

**Carolyn ATKINS, Administrator, State Board of Probation & Parole, and Attorney General of Missouri, Appellees.**

No. 81–1106.

United States Court of Appeals,
Eighth Circuit.

Submitted July 22, 1981.

Decided Dec. 3, 1981.

Certiorari Denied March 29, 1982.

See 102 S.Ct. 1760.

John Ashcroft, Atty. Gen., John M. Morris, argued, Asst. Atty. Gen., Jefferson City, Mo., for appellees.

· George D. Johnson, argued, St. Louis, Mo., for petitioner-appellant.

Before LAY, Chief Judge, and STEPHENSON and McMILLIAN, Circuit Judges.

LAY, Chief Judge.

William Eldridge appeals from the denial of a petition for writ of habeas corpus in the district court for the Eastern District of Missouri. Eldridge was convicted of three counts of robbery first degree in the circuit court of the City of St. Louis. His conviction was affirmed on appeal by the Missouri Court of Appeals. *State v. Eldridge*, 543 S.W.2d 500 (Mo.App.1976). He was sentenced to five years in prison;

he has now served his sentence. At the time his petition was filed in federal district court he was on parole and sought his discharge from the custody of Carolyn Atkins, the Administrator for the Missouri State Board of Probation and Parole.[1] Although petitioner presents various attacks on his conviction, his primary allegation is that he was not afforded effective assistance of counsel at his trial in state court.[2] The federal district court, the Honorable James H. Meredith presiding, denied his petition. The decision to deny was based primarily upon the report and recommendation of the magistrate. In both the Missouri Supreme Court as well as in the federal district court, the rejection of petitioner's claims was based on the finding that trial counsel's failure to call certain witnesses was related to trial strategy. We view petitioner's claim more broadly and find as a matter of law that he has been denied effective assistance of counsel in violation of the fourteenth amendment of the Constitution. We find that the state public defender who served as trial counsel (1) failed to properly investigate and interview eyewitnesses to the robbery and (2) failed to adequately investigate and provide evidence relating to a substantial defense of misidentification. We reverse and remand with directions to the trial court to grant the writ of habeas corpus.

*Facts.*

About 6:30 in the evening of November 15, 1974, two black males entered John's Tavern in St. Louis, drew pistols, announced a holdup, and told everyone to lie on the floor. One man went behind the bar, faced John Wilfert, the tavern owner, and told him to hand over all the money from the cash register. The other man remained at the back of the tavern. After taking the money from Wilfert, the two men told the patrons to throw their wallets and purses out on the floor. Both robbers then searched these for cash and valuables.

After the robbers left the scene, John Wilfert called the police. The police arrived shortly after the call was made and obtained a description of the two men from the victims of the robbery. At trial a police officer testified that the description given was as follows:

> One man was light complected, very close haircut, thin build. The other was taller, about six feet, dark complected and wearing a dark coat and green checked pants. Both were carrying guns.

This testimony contradicted the police report. On the report the description set forth was that the light complected man was said to be the taller and carrying a silver-colored gun.

Steve Wright, one of the victims, delivered auto parts in that neighborhood. He told police that he had often seen the man he believed was the robber during the course of his deliveries. Winston Gates, another victim and a friend of Wright, told police that *one of the subjects involved in the robbery had robbed the tavern eight days before.* Both Gates and Wright said they had previously seen the *tall, light complected man* entering a house on the 3200 block of Lucas. Wright and Gates went with the police to the area Wright had described. They saw William Eldridge, who is very dark complected, descending the steps of the home of Constance McDonald, a cousin with whom Eldridge had been staying during his visit to St. Louis. Wright told police that Eldridge was the robber and Gates concurred. Eldridge was arrested and searched. At this time petitioner was wearing a long gray fur overcoat and green and white checked pants. A chrome ammunition clip and some bullets were found in the pocket of his overcoat. The police then took Eldridge to John's Tavern where Doro-

---

1. Petitioner's parole ended August 20, 1981. Because of collateral consequences which can follow from his conviction, the expiration of petitioner's sentence has not mooted this cause. *See Carafas v. LaVallee,* 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1967).

2. Petitioner raised this contention first in a state 27.26 proceeding and thereafter in the Missouri Supreme Court. His claim was rejected. *See Eldridge v. State,* 592 S.W.2d 738 (Mo.1979).

thy Wright also identified him as the robber who went behind the bar. Neither Wilfert, the tavern owner, nor any other eyewitness, identified him.

Eldridge was jailed. He lacked adequate funds to retain an attorney beyond his arraignment. An Assistant Public Defender was appointed to represent him. Upon receiving the case, appointed counsel obtained the police report. He interviewed Eldridge several times, obtaining from him the names of a number of potential alibi witnesses. From this information, counsel prepared an investigative report and assigned the Public Defender's investigator, Richard Woods, to interview these and other potential witnesses. Eldridge told his counsel that he had not been involved in the robbery. He also told him that except for the time he purchased two records at a neighborhood record shop, he had been at the home of his cousin when the robbery occurred. He had his cousin deliver to counsel the receipt from the record shop, upon which appeared the name of the sales clerk, Edgar Taylor. Petitioner asked his counsel to call Taylor as a witness. Petitioner also told his counsel that there was a man in the same jail who looked remarkably like himself, and that he had heard that the other fellow, Willie Price, was charged *with the same robbery*. Price had been arrested later and charged with the same robbery. Eldridge gave his counsel a newspaper which had Price's picture over Eldridge's name, and an accompanying story which included a statement charging that Eldridge had robbed John's Tavern a week prior to the November 15 robbery. Woods interviewed both Taylor and Price. Price told Woods that he would take the fifth amendment if called. Taylor stated that if called he would testify that he did not want to get involved and would say that he did not remember anything.

There is a dispute whether petitioner asked his attorney to call Willie Coburn as a witness. Coburn was Eldridge's cousin. At a postconviction hearing he testified that Eldridge owned a silver-colored pistol with pearl handles. He testified further that Coburn had the gun at his house at the time

of the robbery. Coburn stated that he made himself available at the trial for the purpose of offering this corroborating testimony. Petitioner's counsel testified that, contrary to petitioner's claim, he had no recollection of ever being given Coburn's name. The Missouri Supreme Court concluded that counsel was not told about Coburn. *Eldridge*, 592 S.W.2d at 741. Although the investigator *reported that Taylor did corroborate* Eldridge's alibi and that *Price did resemble Eldridge*, no further attempt was made by trial counsel to get either of them to testify.

At trial Eldridge denied any involvement with the robbery. He testified that on November 15, 1974, he returned to the home of Constance McDonald after a few days stay with Willie Coburn. He returned at 2:30 that afternoon. From 2:30 until 6:00 he watched television with his cousin and her family. At 6:00 he walked to the neighborhood record store to purchase two records. He returned to the house at approximately 6:20. He testified that he had put the clip and bullets in his overcoat pocket because the children in the house had been into his suitcase and were playing with them.

Several family members corroborated Eldridge's testimony and the record receipt was introduced. The defense attorney's attempts at impeaching the prosecution witnesses' testimony consisted of trying to show that they had been drinking, and that the light was too poor to make a reliable identification. At the close of the evidence, instructions, and arguments of counsel, the jury found petitioner guilty as charged.

*Ineffective Assistance of Counsel.*

 To prevail on his claim of ineffective counsel, petitioner must show "that his attorney failed to exercise the customary skill and diligence that a reasonably competent attorney would perform under similar circumstances, and that he was prejudiced thereby." *Drake v. Wyrick*, 640 F.2d 912, 914 (8th Cir. 1981) *quoting United States v. Hood*, 593 F.2d 293, 297 (8th Cir. 1979). There is a presumption that counsel has rendered effective assistance. *Thomas v.*

*Wyrick*, 535 F.2d 407, 413 (8th Cir.), *cert. denied*, 429 U.S. 868, 97 S.Ct. 178, 50 L.Ed.2d 148 (1976). It is also true that petitioner bears a heavy burden of proving that prejudice resulted from alleged ineffective assistance of counsel. *Drake*, 640 F.2d at 914; *Tyler v. Wyrick*, 635 F.2d 752, 754 (8th Cir. 1980); *Johnson v. United States*, 506 F.2d 640, 645 (8th Cir. 1975), *cert. denied*, 420 U.S. 978, 95 S.Ct. 1404, 43 L.Ed.2d 659 (1975). The exercise of reasonable judgment, even when hindsight reveals a mistake in that judgment, does not render a lawyer negligent or lacking in competence in rendering his services. *Reynolds v. Mabry*, 574 F.2d 978, 979 (8th Cir. 1978).

Courts will often cast the standard of customary skill and diligence in terms of an attorney's duty. In regard to trial counsel's duties to investigate possible defenses and to call witnesses, we have adopted the following standard:

It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to guilt and degree of guilt or penalty. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or his stated desire to plead guilty.

American Bar Association Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function § 4.1 (Approved Draft 1971).

*See also Reynolds*, 574 F.2d at 980; *Garza v. Wolff*, 528 F.2d 208 (8th Cir. 1975); *Wolfs v. Britton*, 509 F.2d 304, 309–11 (8th Cir. 1975); *McQueen v. Swenson*, 498 F.2d 207, 216 (8th Cir. 1974).

▮ Petitioner's claims of failure to properly investigate and interview all known witnesses, failure to call certain witnesses and failure to present the defense of mistaken identification are all interrelated. Although the state asserts that counsel did not present the claim of failure to properly investigate and interview all known eyewitnesses to the state court, the record demonstrates otherwise. Petitioner's original 27.-26 petition focused on counsel's failure to interview and call Price, Taylor, and Coburn; however, his brief before the Missouri Supreme Court as well as his posthearing motions relate to this overall claim raised here. We conclude that the record as it relates to the claim of ineffective counsel cannot be divided piecemeal when the question is whether an individual has been wrongfully convicted. From the beginning of this case petitioner has vigorously asserted his innocence. He has long made the claim that his trial counsel failed to properly investigate and pursue his defense of mistaken identification. Our analysis of the record convinces us that with proper investigation this defense should have been pursued and presented at the petitioner's state trial. We find that petitioner was materially prejudiced by counsel's failure to do so.

The state urges that petitioner's argument is based primarily on hindsight and that trial counsel cannot be faulted for not pursuing investigative leads of which he was not aware. This argument relates primarily to the existence of other police reports relating to Price, Eldridge's look-alike. Counsel did obtain the police report of the November 15 robbery, but did not obtain three other police reports. These were reports of two other robberies and one police lineup; Eldridge was not named as a participant in either of these two robberies or in the lineup. One police report was a report of the November 7 robbery of John's Tavern which implicated Price. The second was a report of a robbery occurring on November 24, 1974, that led to the capture of Price and his 5′4″ accomplice, Hosea Simpson. The third report, dated November 26, 1974, related to a lineup in which Winston Gates, an eyewitness to the November 15 robbery who implicated Eldridge, identified Price as one of the robbers in both the November 7 and November 15 robberies.

Petitioner argues that his trial counsel failed to properly investigate and obtain the other reports. On the surface, trial counsel should not be faulted for failing to investigate police reports which did not implicate Eldridge. However, our study of the record demonstrates that through the exercise of reasonable diligence in the investigation and interviewing of the eyewitnesses to the November 15 robbery listed on the November 15 police report, reasonable counsel would have been alerted to the relevancy of these other reports. The positive identification of Price as a definite robbery suspect in both the November 7 and the November 15 robberies, along with the description of the two November 15 robbers, was by itself enough evidence to provide strong indication that Price and Eldridge did not act together in the November 15 robbery. Proper investigation would have uncovered many other factors which compel the same conclusion.

Trial counsel testified that he requested Woods to investigate the robbery. At petitioner's request Woods did interview Edgar Taylor, who was a clerk at the record shop. Woods also talked to Willie Price after petitioner told trial counsel that he had just learned of Price when Price was brought to the jail after the November 24 robbery. There is little evidence that Woods interviewed any other witnesses.

Counsel did not interview Taylor, Price, or any of the prosecution witnesses. Counsel testified that it was his policy not to talk to defense witnesses unless they were to be used. What is more significant, however, is that counsel testified that he did not interview any of the prosecution witnesses. Although this is somewhat equivocally disputed by the state, the record is clear that counsel did not interview Steve Wright, Dorothy Wright, Winston Gates, Benny Simms, John Wilfert, Henry Lawrence, or Mary Brown, all of whom the police listed as eyewitnesses to the November 15 robbery. There is no evidence that Woods interviewed John Wilfert, the tavern owner who had a face-to-face confrontation with the robber who went behind the bar. An investigation of the prosecution witnesses would have disclosed sufficient facts to alert competent counsel to seek out the police report of the November 7 robbery and the other reports pertaining to Price's arrest and lineup.

For example, an interview of even three of the prosecution witnesses would have been extremely helpful. Both Steve Wright and Gates went with the police immediately after the robbery to locate the "light complected" and "taller" robber in the 3200 block of Lucas where he had been seen on *numerous* occasions. They saw Eldridge coming down the steps of a house. The police arrested and searched Eldridge, finding a chrome ammunition clip and some bullets in his overcoat pocket. He was taken to the tavern where Steven Wright's wife, Dorothy, identified him. Interviewing *these* witnesses would have revealed several relevant facts:

(1) Both Gates and Wright stated they could identify one of the robbers (the one they went to look for when they found Eldridge). Gates originally claimed that the tall, light complected robber was one of the men who robbed the tavern a week and a half before (November 7). Eldridge claimed that he was in Milwaukee at that time; this claim could have been easily verified. Also, Gates testified at trial on the motion to suppress that he had not seen either robber before the November 15 robbery. Yet the police reports disclose that he stated he had seen Price (who he thought was Eldridge) in the tavern robbery of November 7. This fact was not brought out at trial.

(2) When Gates and Wright went with the police they were looking for a tall, light complected subject. Eldridge, in contrast, is very dark complected.

(3) At a subsequent lineup Gates, Dorothy Wright, Lawrence, and Simms implicated Price in the November 15 robbery. Gates also picked him out as the November 7 robber. There is no clarification in the record as to whether Gates thought the man arrested on the day of the robbery was the same man he identified in the lineup.

Evidently no one, including the prosecutor, considered this to be an important factor at the time.

(4) However, at petitioner's trial Gates identified Eldridge as the man he saw in the lineup at the police station. Petitioner was never in a lineup; the man Gates identified was indeed Price. This fact was never brought out at trial.

(5) Price lived in the same block as petitioner's cousin.

(6) The police report on the November 15 robbery listed the telephone numbers of seven eyewitnesses together with the comment that except for Winston Gates, Steven Wright, and Dorothy Wright "all other persons originally involved couldn't make a decision about the 'subject.'" This notation itself should have alerted defense counsel that those who could not positively identify Eldridge immediately afterward could provide exculpatory evidence.

(7) There was obvious confusion and inconsistency about the height and complexion of the two robbers that should have moved a prudent attorney to question whether the identification of Eldridge was proper. If counsel had interviewed the prosecution witnesses and investigated the other police reports he would have been alerted to the possibility of mistaken identification.

On the police report the tall, light complected robber was estimated to be 6' 0" or 6' 1". Eldridge is 6' 0". At the trial (by necessity) the dark complected robber became the tall one—allegedly six inches taller than the light complected subject. Price and Eldridge are approximately the same height, but Hosea Simpson, who was Price's accomplice in the November 24 robbery, was about six inches shorter than Price. Eldridge was alleged at trial to be the tall robber who carried a dark colored weapon. Yet, according to the police report the tall robber had a silver-colored weapon. Price did have a silver-colored weapon when he was arrested. In addition, the police report

of November 15 should have alerted a reasonable person that the identification was not right. It read:

> The man carrying a chrome pistol was light-skinned, taller, thin, with short hair, and wore a denim jacket. The second man was shorter, darker complected, carried a dark-colored pistol, and wore a dark blue short jacket with green and white checked pants.

Thus at trial, completely inconsistent with the report given to the police immediately following the robbery, it turned out that Eldridge was taller than Price, was dark complected, and owned a dark gun.[3]

(8) Neither counsel nor his investigator interviewed the tavern owner, John Wilfert, before the trial. This omission is particularly glaring since three eyewitnesses testified that Eldridge was the robber who went behind the bar and emptied the cash register in a face-to-face confrontation with Wilfert. Yet, when the police brought Eldridge to the tavern Wilfert stated that he "knew" the suspect was *not* one of the robbers. The record strongly suggests that the man the police brought to the bar within forty-five minutes of the robbery was Eldridge. However, at trial there was some confusion whether the police had brought two suspects to the tavern or just Eldridge. If counsel had not been unaware of Wilfert's previous statement that Eldridge was not one of the robbers, he could have made that fact clear to the jury. At the least, sufficient pretrial investigation would have revealed whether Eldridge was the suspect Wilfert was shown right after the robbery. Furthermore, counsel would have realized that Gates and the Wrights had made incorrect identifications. An immediate investigation of their identification would have led to Price. Further, a reasonable attorney would have requested a lineup with Price and Simpson alongside Eldridge. Reliable identification would have been established if the lineup was conducted before the eyewitnesses to the November 15 robbery.

---

3. Willie Coburn testified at the 27.26 hearing that Eldridge actually owned a silver-colored gun and that the gun was locked in his house at the time of the robbery.

Although this analysis may argumentatively be assessed as hindsight reasoning, the record discloses that all of these investigative leads were present before trial but were never pursued because defense counsel did not interview any of the eyewitnesses to the robbery. Counsel did not investigate because he conclusorily decided that Eldridge was guilty and that further investigation would not do any good.

Thus, defense counsel's preparation and subsequent trial strategy was *based in part upon his own conclusory decision that Eldridge and Price were the two robbers.* Once he made that conclusion it is easy to see why he failed to investigate further, why he failed to pursue calling Taylor as an alibi witness, and why he made no further effort to call Price as a witness. The testimony of Taylor and Price might have been helpful. Eldridge had a receipt from Taylor's record shop. Taylor could have verified petitioner's presence at the record shop, but he told investigator Woods that although he remembered Eldridge he did not wish to get involved. Price allegedly told Woods that he would take the fifth amendment. Price testified at the federal hearing that no one asked him to testify and if asked he would have appeared. Price's testimony at the federal hearing completely exonerated Eldridge. The magistrate did not credit his testimony, however. We do not dispute the credibility finding here.

■ The important factor here, however, is that trial counsel made no effort to contact or subpoena either Taylor or Price immediately before or at trial. Taylor had no legal right, as a material witness, to remain silent. When a man's liberty is at stake counsel owes a greater duty than to simply accept someone's hearsay statement that the witness would rather not testify. A lawyer's duty to defend rises to a greater measure of responsibility. A competent lawyer's duty is to utilize every voluntary effort to persuade a witness who possesses material facts and knowledge of an event to testify and then, if unsuccessful, to subpoena him to court in order to allow the judge to use his power to persuade the witness to present material evidence. We cannot accept trial counsel's excuse that he *thought* Taylor would not cooperate. Counsel need not attain perfection, but he must exercise reasonable diligence to produce exculpatory evidence.

■ Much of the same reasoning applies to counsel's failure to interview Price. Price's credibility is not at issue. What is at issue is whether trial counsel failed to exercise reasonable diligence in failing to interview Price before trial. The justification offered is that Price told the investigator before Eldridge's trial that if he were called to testify he would take the fifth amendment. But Price's circumstances changed after he told Woods he would take the fifth amendment. He later voluntarily testified in the federal habeas hearing.[4] Moreover, Price had a lawyer; yet his lawyer was not approached to see if Price would testify for Eldridge. Eldridge's counsel just *assumed* that Price would not help. Under the circumstances, greater effort was required of counsel than simply accepting his investigator's earlier statement that Price would take the fifth amendment. This is particularly true where the police reports *definitely established Price as one of the November 15 robbers and his accomplice as a much shorter man.* Petitioner's present counsel somehow induced Price to "tell all" at the federal hearing. Price indicated he would have given the same testimony at the state trial if he had been called. We need not speculate whether it would have made a difference in the final result. It would appear that Price and Eldridge did not even know one another before this case. It is also

---

4. Price pleaded guilty *before* the federal habeas hearing, but *after* the 27.26 hearing. The state trial judge sustained the state's objection at the 27.26 hearing to petitioner's calling Price. Even though Price had not pleaded guilty, both petitioner's counsel and Price claim he would have testified. The alleged reason the state trial judge refused to allow petitioner to call Price was because Price's counsel was not notified or present. Price's counsel could easily have been contacted.

undisputed that they had an uncanny resemblance to one another; yet none of the eyewitnesses of the November 15 robbery reported any similarity between the two robbers.

In *McQueen v. Swenson*, 498 F.2d 207 (8th Cir. 1974), and *Thomas v. Wyrick*, 535 F.2d 407 (8th Cir. 1976), this court examined defense counsel's custom of not interviewing prosecution witnesses. In *McQueen* this court found that this "absurd and dangerous policy" contravened the attorney's essential duty to make an adequate factual investigation and could only be viewed "as an abdication—not an exercise—of his professional judgment." 498 F.2d at 216.

▮ In addition to the critical omission of counsel in not interviewing Steve Wright and Winston Gates, counsel was also ineffective in failing to interview Dorothy Wright. Although Dorothy Wright testified at the federal evidentiary hearing that she is now not certain whether Eldridge was a robber, that testimony is not materi-

al; however, it does tend to corroborate the claim that if proper investigation had been conducted before trial many of the inconsistencies would have surfaced. Proper investigation could have alerted counsel to investigate Price and his commission of other robberies. This in turn would have demonstrated strong evidence of mistaken identification. We conclude that trial counsel in this case owed a duty (1) to investigate and interview all eyewitnesses to the robbery, (2) to pursue the substantial defense of mistaken identification, and (3) to solicit the testimony of all witnesses who allegedly possessed material facts and knowledge concerning the defendant's guilt or innocence. Trial counsel did none of these things and petitioner was materially prejudiced by counsel's failure. To say only hindsight judgment is at stake ignores the factual record before us.

▮ We conclude that counsel was ineffective within constitutional standards.[5]

---

5. We are aware of the limited nature of the review provided federal courts by 28 U.S.C. § 2254. We have applied the "presumption of correctness" which is mandated by the statute to the factual determinations made by the Missouri state courts. *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). Thus, since the state court's finding that Eldridge did *not* tell trial counsel about Coburn is supported by the record, it is presumed to be correct. Similarly, the state court's finding that Price told Woods that he would take the fifth amendment protection is entitled to the same presumption.

Section 2254 requires a federal habeas court to presume the correctness of the state court's *factual findings*. As stated by Justice Brennan in *Sumner v. Mata*, 449 U.S. at 555, 101 S.Ct. at 773:

The factual issues to which § 2254(d) applies are "basic, primary, or historical facts: facts 'in the sense of a recital of external events and the credibility of their narrators. . . .' " *Cuyler v. Sullivan*, 446 U.S. 335, 342 [100 S.Ct. 1708, 1714, 64 L.Ed.2d 333] (1980) (quoting *Townsend v. Sain*, 372 U.S. 293, 309 n.6 [83 S.Ct. 745, 755 n.6, 9 L.Ed.2d 770] (1963)). Section 2254(d) does not, however, bar a federal court from reviewing "a mixed determination of law and fact that requires the application of legal principles to the historical facts of this case." *Id. see Brewer v. Williams*, 430 U.S. 387, 403–404 [97 S.Ct. 1232, 1241–1242, 51 L.Ed.2d 424] (1977).

*Sumner v. Mata*, 449 U.S. at 555, 101 S.Ct. at 773. (Brennan, J., dissenting).

Whether trial counsel's actions were sufficient to meet the standard of effective assistance is a mixed determination of law and fact that requires the application of legal principles to the historical facts of this case. *Cuyler v. Sullivan*, 446 U.S. at 342, 100 S.Ct. at 1714; cf. *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424; *Neil v. Biggers*, 409 U.S. 188, 193 n.3, 93 S.Ct. 375, 379 n.3, 34 L.Ed.2d 401 (1972).

The failure to interview prosecution witnesses is a violation of counsel's constitutional duty to render effective assistance. *Morrow v. Parratt*, 574 F.2d 411 (8th Cir. 1978); *Thomas v. Wyrick*, 535 F.2d 407, 413 (8th Cir. 1976); *McQueen v. Swenson*, 498 F.2d 207, 216 (8th Cir. 1974). *Compare Plant v. Wyrick*, 636 F.2d 188 (8th Cir. 1980); *Beran v. United States*, 580 F.2d 324 (8th Cir. 1978), *cert. denied*, 440 U.S. 946, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979) (no demonstration that failure to interview was prejudicial). We have already discussed how counsel's failure to interview these witnesses prevented him from questioning his own belief that Price and Eldridge were guilty of the crime charged.

The state court as well as the federal district court found it was a matter of trial strategy not to call Coburn, Taylor, or Price to the stand. We think the presumption of correctness under section 2254(d) applies to this finding. We also agree that counsel need not call an alibi witness if he reasonably believes that the witness

We reverse and vacate the judgment denying his writ. Eldridge has served time in prison; he should be released from all state custody and his conviction set aside. We direct a writ of habeas corpus be issued.

will not help his client. However, counsel has a duty to use witnesses named by a defendant who may assist in the defense. *Eldridge v. State*, 592 S.W.2d 738 (Mo.1979); *Jones v. State*, 491 S.W.2d 233 (Mo.1973). To fulfill that duty counsel must make a reasonable attempt to investigate a material witness' knowledge. The state court did not inquire into the reasonableness of counsel's trial strategy. Counsel made no reasonable attempt at the time of trial to learn whether Taylor or Price really would refuse to testify to what they knew. His "strategy" not to use them was not so much trial strategy as it was an accommodation to his own inadequate trial preparation.

We find as a matter of law that counsel failed to make proper use of witnesses named by the defendant who could have assisted in the defense. Similarly, under the facts and circumstances developed before trial, particularly as they related to the strong descriptive evidence suggesting that Price and Eldridge *did not* act together in the November 15 robbery, defense counsel had a further duty to discuss Eldridge's involvement with Price through his appointed attorney. He made no effort to do this. Thus, although it may have been a trial decision of counsel not to pursue Price's testimony it was counsel's lack of preparation which went a long way in inducing him to make it.