**Earnest Lee LANGSTON, Appellant,**

v.

**Donald WYRICK, Appellee.**

**No. 82–1620.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 14, 1982.

Decided Dec. 22, 1982.

Rehearing Denied Jan. 18, 1983.

---

Alene V. Haskell, Husch, Eppenberger, Donohue, Elson & Cornfeld, St. Louis, Mo., for appellant.

John Ashcroft, Atty. Gen., Kelly Klopfenstein, Asst. Atty. Gen., Jefferson City, Mo., for appellee.

Before BRIGHT and ARNOLD, Circuit Judges, and HUNTER,* Senior District Judge.

BRIGHT, Circuit Judge.

Earnest Lee Langston was convicted in the Missouri state courts of robbery with a dangerous and deadly weapon, and assault with intent to kill with malice. The state trial judge sentenced Langston to concurrent sentences of fifty years on the robbery charge and life imprisonment on the assault charge. Following an unsuccessful appeal and denial of postconviction remedies in state courts, Langston filed a petition for a

* ELMO B. HUNTER, United States Senior District Judge for the Western District of Missouri, sitting by designation.

writ of habeas corpus in federal district court, alleging that he had received ineffective assistance of counsel at his trial, the same issue he had presented to the state courts in his effort to obtain postconviction relief. The district court[1] denied relief, and Langston brings this appeal. We affirm.

I. *Background.*

On June 3, 1972, a black male entered Meyer's Market, a small neighborhood store on South Taylor Street in St. Louis, Missouri, and robbed and shot the proprietor, Ruth Stickler, once in the chest. Later, police arrested Langston and the state charged Langston with robbery, first degree, and assault with intent to kill with malice in connection with the crime. A jury found Langston guilty as charged at a trial held in the circuit court for the City of St. Louis during January 1973.

The evidence adduced at trial showed that the assailant in the holdup, a black male, had entered Meyer's Market alone at approximately 2:45 p.m. Present in the store at the time besides the proprietor, Ruth Stickler, were several children, including Cheryl Martin, then fourteen-years-old. The children remained in the store for a few minutes after the man entered, then left together. As soon as the children had departed, the assailant pointed a gun at Mrs. Stickler and demanded money. After she gave him the money from the cash register, he asked for her gun. She denied having one and turned to the side, whereupon the assailant shot her and fled.

Cheryl Martin testified at trial that she looked at the face of the man who entered the store. She further testified that after leaving with the other children, she crossed the street, and walked three or four feet on the other side when she heard a gunshot, and that she then "hollered" at the other children to "come on, somebody just shot a gun over at the store." She stated that she turned around and saw the assailant come out of the store with a gun in his hand, go towards the alley, and get into a yellow car; that a black woman was sitting in the passenger seat of the car, and that the car took off down Taylor Street, at which point Cheryl started for the store. Cheryl stated that she provided a description of the assailant to the police at the scene. At trial she also identified the children with her in Meyer's Market as Kim Bansketer; Kim's brother, David Bansketer; and Sheryl Walburn. None of these other children were called to testify at the trial.

Shortly after the robbery of Meyer's Market, the police arrested and jailed Langston as a suspect on a subsequent and different robbery charge. While in police custody, detectives questioned Langston about the robbery and assault on Ruth Stickler. Langston denied committing the offense, waived his rights to a lineup and a lawyer, and requested that he be confronted with the victim. Two detectives took Langston to the hospital, where Mrs. Stickler positively identified him as her assailant.

Mrs. Stickler identified Langston as her assailant again at trial. Cheryl Martin also identified Langston at trial as the assailant. Langston testified at trial that he did not commit the robbery and shooting, and was, in fact, at home until 5:30 p.m. on the day in question. The defense presented witnesses in support of Langston's alibi defense.

The jury found Langston guilty as charged, and the trial court, on May 11, 1973, imposed sentences. On appeal, the Missouri Court of Appeals affirmed. *State v. Langston*, 515 S.W.2d 852 (Mo.App.1974).

On January 23, 1976, Langston filed a *pro se* motion to vacate, set aside, or correct judgment pursuant to Missouri Supreme Court Rule 27.26. Langston raised two is-

---

1. The district court referred Langston's petition to a United States Magistrate (The Honorable David D. Noce, United States Magistrate, Eastern District of Missouri) for report and recommendation. The magistrate recommended denial of the petition for a writ of habeas corpus. The district court (The Honorable Edward L. Filippine, United States District Judge, Eastern District of Missouri) adopted the magistrate's report and recommendation and dismissed Langston's petition for relief.

sues in his 27.26 motion, one dealing with ineffective assistance of counsel, and one dealing with double jeopardy. Langston urged a number of grounds in support of his charge of ineffective assistance of counsel, but the court considered only one ground to be a major concern: whether Langston received ineffective assistance of counsel because his attorney failed to investigate any of the state's witnesses before trial, and that, had he done so, he would have discovered evidence which would have destroyed the credibility of eyewitness Cheryl Martin.

Langston received an evidentiary hearing on his Rule 27.26 motion in the circuit court of the City of St. Louis. The court conducted the hearing in two sessions, one on November 19, 1976, and the other on May 19, 1977. On November 19, 1976, the court heard testimony from nine witnesses. Six of the witnesses had been endorsed by the state on the original information upon which Langston was tried in January 1973,[2] all of whom testified that neither Langston's trial attorney, Karl Lang, nor anyone on his behalf, had contacted them or talked with them for any purpose prior to Langston's trial in January 1973.

Attorney Lang also testified at the November 1976 hearing. He acknowledged that prior to Langston's trial, neither he nor anyone on his behalf had contacted any of the witnesses endorsed by the state, including Cheryl Martin. Nor did he contact any of the three children Cheryl Martin contended were with her in the store on the day of the robbery. He further stated that his normal procedure in most trials is not to interview the state's witnesses, though he stated that sometimes he does, and occasionally takes a deposition. But in the case in question, he did not interview any of the state's witnesses because, although there was no formal discovery at the time, he had managed to obtain police reports through his own sources, and felt he knew "pretty much" what the witnesses were going to

testify. He further stated that the testimony that came out at trial was "more or less" consistent with police reports.

Prior to trial, Lang did go to the scene of the crime and made sketches, although he was not sure he had entered the store premises because he thought the business was closed at the time. Lang talked to Langston before trial, although he did not recall how many times. During these conversations, Langston denied all knowledge of the incident. At the time Lang entered his appearance as attorney for Langston, the case had already been set on the trial docket. The public defender had previously represented Langston, and while Lang could not specifically recall receiving any information from the public defender, he testified that normally he would talk with the public defender and read the public defender's file.

Lang testified that he presented alibi witnesses at the trial, including family members, who testified Langston was at home at the time of the robbery. Lang stated that he had interviewed all alibi witnesses at his office prior to trial. He also testified that he had represented Langston on another robbery charge, also in front of a jury, using the same investigative techniques, and that his defense resulted in an acquittal for Langston.

The remainder of the testimony at the November 1976 and May 1977 hearings focused on who was in Meyer's Market immediately prior to the robbery, and whether Cheryl Martin actually saw the robber leave the store immediately after the robbery as she had testified at trial.

Although Cheryl Martin testified at the original trial that Sheryl Walburn was in Meyer's Market with her at the time the assailant entered, Sheryl Walburn denied having been in or near the store at the time, and stated she was home in bed sleeping when the robbery occurred.

---

**2.** These six witnesses were Ruth Stickler and police officers Donald Allen, Steven Georgeff, Richard Gregorc, Wayne Thornberry, and Kenneth Whittler.

Kim Bansketer [3] testified at both the November 1976 and May 1977 hearings. Bansketer testified that Cheryl Martin had said nothing to Kim about seeing anyone leaving the store with a gun at the time of the robbery, nor did she talk to Kim about seeing anything relating to the robbery, and gave no indication of knowing a robbery had taken place before the police arrived.

Cheryl Martin also testified at the May 1977 hearing. Her testimony was in many respects the same as her trial testimony.

The state trial judge hearing the Rule 27.26 proceeding characterized Lang's decision not to interview, depose, or otherwise personally communicate with the state's endorsed witnesses as a "conscious trial strategy." The judge observed that "[t]his was a conscious trial strategy that this experienced attorney used in nearly all of his cases on the theory that it would prevent the witnesses from knowing the trend of questioning he intended to follow at the trial." The state court also commented that the trial attorney had relied upon police reports, "and there is nothing in either the trial record or the evidence on the motion that such recordings were substantially different from the testimony elicited on trial." The court also noted parenthetically that "this same tactic was used by this attorney to defend this defendant in another robbery case where it was successful— the defendant was acquitted." The court concluded that Lang's decision was "not so devoid of reason or rationale as to be unacceptable or below the norm for adequate representation." The court therefore denied relief. The Missouri Court of Appeals affirmed the decision on appeal. *Langston v. State,* 615 S.W.2d 501 (Mo.App.1981).

In November 1981, Langston filed this petition for a writ of habeas corpus in federal district court and, as already noted, did not obtain any relief. Langston on appeal alleges that he was denied effective assistance of counsel because his defense counsel failed to (1) contact or interview any of the state's endorsed witnesses, (2) pursue known investigative leads and find other witnesses, particularly Kim Bansketer and Sheryl Walburn, whose testimony, Langston alleges, would have impeached the credibility of Cheryl Martin at trial, and (3) exercise reasonably competent care and skill in making use of information in police reports he obtained.

## II. *Discussion.*

■ To demonstrate ineffective assistance of counsel, Langston must show (1) that his attorney failed to exercise the customary skills and diligence that a reasonably competent attorney would perform under similar circumstances, and (2) that he suffered material prejudice as a result. *Morrow v. Parratt,* 574 F.2d 411, 412–13 (8th Cir.1978). A presumption exists that counsel is competent, and the exercise of reasonable judgment, even when hindsight reveals a mistake, does not render a lawyer negligent or lacking in competence in rendering his services. *Reynolds v. Mabry,* 574 F.2d 978, 979 (8th Cir.1978).

■ The duties of a reasonably competent attorney include the duty to conduct a prompt and thorough investigation of the case. As we observed in *Eldridge v. Atkins,* 665 F.2d 228 (8th Cir.1981), *cert. denied,* 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 168 (1982),

[i]t is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to guilt and degree of guilt or penalty. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or his stated desire to plead guilty. [*Id.* at 232, *quoting* American Bar Association Project on Standards for Criminal Justice, Standards Relating to

---

**3.** Kim Bansketer married after Langston's trial, but before the Rule 27.26 hearings. Her married name at the time of the hearings was Beamer. However, she will be referred to throughout the opinion as Kim Bansketer.

the Prosecution Function and the Defense Function § 4.1.]

■ We have held that defense counsel's failure to interview witnesses can result in a finding of ineffective assistance. *Eldridge v. Atkins, supra; Thomas v. Wyrick,* 535 F.2d 407 (8th Cir.), *cert. denied,* 429 U.S. 868, 97 S.Ct. 178, 50 L.Ed.2d 148 (1976). However, we have not adopted a rule that counsel's failure to interview the state's endorsed witnesses amounts to a *per se* breach of trial counsel's duty to render effective assistance. Whether defense counsel's failure to interview witnesses renders his assistance ineffective depends on the facts of each case.

Langston's first argument on appeal is that his trial counsel rendered ineffective service by reason of his failure to contact or interview any of the prosecution's endorsed witnesses, including Cheryl Martin. In particular, Langston asserts that trial counsel did not know, because of his failure to interview Cheryl Martin, that she could identify the robber. When she did so at

trial, Langston alleges that his trial counsel was taken by surprise and was unable to cross-examine her effectively by pointing out inconsistencies between her statements in the police report and her testimony at trial.[4]

■ Ordinarily, a defense attorney must interview witnesses who have knowledge of the crime. The record in this case, however, supports the state court's finding that Lang's failure to interview the state's witnesses did not constitute ineffective assistance. Counsel correctly estimated that attempting to pursue a misidentification defense under the circumstances would not succeed. According to police reports in the possession of Lang, Langston had been positively identified by four different people as being the perpetrator of three separate robberies.[5] The police report indicated that Ruth Stickler's identification on confronting Langston had been very positive. In two of the robberies, the modus operandi was identical: a black male assailant leaving the scene of the crime in the company

4. For example, a police report in Lang's possession indicated Cheryl Martin told the officer at the scene that the robber fled in a white car, that the car was operated by a black female, and that the car went through the alley and out of sight. At trial, Cheryl Martin testified that the getaway car was yellow, that it was driven by the robber, and that the car wasn't driven in the alley at all, but entered directly onto Taylor Street.

5. On June 2, 1972, an assailant robbed Sonny's Restaurant at 4370 Manchester Street in St. Louis. The police report on this incident noted that after robbing the store and sexually molesting a waitress, a tall black male fled with a black woman in a white automobile. On June 3, 1972, an assailant robbed Meyer's Market and shot Ruth Stickler. The police report of the June 3 incident described the assailant as a black male who had fled the scene of the crime in a white automobile driven by a black woman.

A supplementary police report, filed June 10, 1972, in the case of the robbery of Sonny's Restaurant, contained more cogent information. An off-duty policeman, who happened to be drinking coffee in Sonny's Restaurant on June 10, 1972, was told by the waitress who had been robbed and molested that the assailant had just walked by the restaurant. The off-duty officer then left the restaurant and arrested the suspect, who identified himself as Langston. Immediately after the arrest, the

waitress positively identified Langston as the assailant. The waitress again positively identified Langston as the assailant later the same day at the police station.

A supplementary police report on the robbery at Meyer's Market, filed June 10, 1972, contained more pertinent information. The report noted that on the basis of the description of the assailant in the shooting of Mrs. Stickler and several telephone calls informing the police that Langston was responsible for the robbery and shooting at Meyer's Market, the police concluded that Langston might also be responsible for the robbery and shooting of Ruth Stickler. Langston insisted that he did not rob Meyer's Market, waived his right to counsel, and insisted that he be confronted with Mrs. Stickler. Detectives took Langston to the hospital, where Mrs. Stickler positively identified him as her assailant.

The supplementary police report on the robbery of Meyer's Market also noted that due to the similarity of description, the police suspected Langston of having robbed a restaurant at 2623 South Jefferson in St. Louis on June 7, 1972. The victim of that robbery and a witness came to the police station upon police request. Langston waived his right to a lineup. The victim and witness confronted Langston at separate times, and each positively identified him as the assailant.

of a black female in a white automobile. An attorney for Langston faced with the adverse information contained in the police reports may have felt that interviewing possible eyewitnesses would produce unfavorable evidence and serve to focus the witnesses' memories on testimony that would be adverse to Langston. A decision not to interview potential adverse witnesses, on the other hand, could conceivably permit the passage of time to dim those witnesses' memories. Although Lang's trial strategy may have backfired in part because Cheryl Martin unexpectedly identified Langston as the assailant at trial, we cannot hold such a strategy unreasonable under the circumstances.

■ Langston additionally contends that trial counsel provided ineffective assistance because he failed to find and interview two other witnesses, who, Langston contends, would have strongly impeached Cheryl Martin's trial testimony. The state court in the 27.26 hearing found that failure to interview these potential witnesses did not amount to ineffective assistance. The federal magistrate, in reviewing Langston's allegation, stated:

> Neither witness was endorsed by the state. Counsel is not ineffective for failing to interview a witness whose testimony he had no reason to believe would be useful or helpful. *Drake v. Wyrick*, 640 F.2d 912, 914–915 (8th Cir.1981). Even if counsel had learned of the existence of Bansketer and Walburn as possible witnesses, he had no reason to believe that their testimony would be helpful. On the contrary, he had good reason to believe that it would duplicate Cheryl Martin's

testimony, and therefore, would be harmful. Counsel was not ineffective because he failed to locate and interview Bansketer and Walburn.

This analysis is persuasive. We find that, under the circumstances of this case, the failure to find Kim Bansketer and Sheryl Walburn does not establish incompetency of counsel.

Langston argues that the cases of *Eldridge v. Atkins, supra; Thomas v. Wyrick, supra;* and *McQueen v. Swenson,* 498 F.2d 207 (8th Cir.1974), require reversal in this case. We disagree. In *Eldridge,* trial counsel failed to interview witnesses to a robbery even though there was evidence indicating a strong defense of misidentification.[6] We concluded that Eldridge had been denied effective assistance of counsel. In this case, unlike *Eldridge,* there is no evidence indicating a strong misidentification defense. Rather, there was a strong positive identification by the victim in her hospital bed of Langston as her assailant. Moreover, Lang knew that Langston had been positively identified as the perpetrator of other robberies.[7]

The facts in this case are also unlike those in *Thomas v. Wyrick, supra.* In *Thomas,* we determined that the petitioner was denied effective assistance of counsel where his defense counsel failed to interview any witnesses, pursuant to a general policy against doing so. Defense counsel in *Thomas* even failed to interview any of the petitioner's alibi witnesses. In the present case, unlike *Thomas,* trial counsel presented alibi witnesses at trial, including family members, who testified that Langston was at home at the time of the robbery. Lang

---

**6.** In *Eldridge,* three consecutive robberies occurred on November 7, 15, and 24 of 1974. Police arrested Eldridge for the commission of the November 15 robbery. Eldridge had, however, a look-alike, who had been implicated in the November 7 robbery, and who was later arrested for the November 24 robbery. Eldridge's trial counsel failed to procure relevant police reports and interview the prosecution's witnesses even though (1) Eldridge denied committing the robbery, (2) his trial counsel had independent information permitting him to conclude that Eldridge did have a look-alike and that this look-alike fit the description of one of

the robbers given in the police report of the November 15 robbery, (3) his trial counsel had been told by Eldridge that a man who looked like Eldridge was in the same jail and charged with the same robbery, and (4) his trial counsel had obtained a public defender's report stating that a potential witness corroborated Eldridge's alibi.

This court found that a proper investigation, including the interviewing of witnesses by defense counsel, would have revealed a substantial defense of misidentification.

**7.** *See* note 5 *supra.*

stated at the 27.26 hearing that he interviewed the alibi witnesses prior to trial.

*McQueen v. Swenson, supra,* is likewise inapposite. In *McQueen,* petitioner's trial counsel did not attempt to interview any of the prosecution's witnesses. We noted in that case that defense counsel called no witnesses other than the petitioner, that he introduced no documentary or physical evidence, and that he submitted no outside information for impeachment or contradiction. We observed that "the only factual conclusion that can be drawn from the 27.26 hearing is that attorney Brown's sole preparation for the defense of a client charged with first-degree murder was to interview the defendant himself." *Id.* at 213. We held that this lack of pretrial investigation amounted to ineffective assistance of counsel. In the instant case, however, Langston's trial counsel obtained police reports of the robbery, visited the scene of the crime and made sketches, and interviewed and presented alibi witnesses. Under the circumstances disclosed by this record, we cannot say that the conduct of Langston's counsel should be characterized as incompetent as a matter of law.

Accordingly, we affirm the order of the district court dismissing Langston's petition for a writ of habeas corpus.