Jimmy Lee HUDSON, Petitioner,

v.

A.L. LOCKHART, Director, Arkansas
Department of Correction,
Respondent.

Nos. PB–C–84–331, PB–C–85–601.

United States District Court,
E.D. Arkansas,
Pine Bluff Division.

Oct. 28, 1986.

---

Jimmy Lee Hudson, pro se.

Clint Miller, Asst. Atty. Gen., State of
Ark., Little Rock, Ark., for respondent.

## ORDER

ROY, District Judge.

The Court has carefully considered the Objections filed by the Respondent, and concludes that the Magistrate's Proposed Findings and Recommendations should be and are hereby adopted. The petition for a writ of habeas corpus should be and is hereby granted. The Respondent has forty-five (45) days from the date of this Order within which to retry the Petitioner or release him from custody. Thereafter, the writ should issue.

## PROPOSED FINDINGS AND RECOMMENDATIONS

### Filed Oct. 28, 1986

JOHN J. FORSTER, Jr., United States Magistrate.

The Petitioner, Jimmy Lee Hudson, is an inmate presently housed at the Diagnostic Unit of the Arkansas Department of Correction, serving a life sentence resulting from his 1983 conviction on charges of aggravated robbery. On July 18, 1984, Petitioner filed a petition seeking habeas relief from his state conviction and sentence, pursuant to 28 U.S.C. § 2254, alleging that (1) his 6th Amendment rights were violated because his trial counsel was ineffective; (2) his 14th Amendment due process rights were violated because the evidence used to convict him was insufficient; and (3) that his right to an impartial jury selected from a cross section of the community was violated because no blacks were seated on the jury panel which heard his case. On December 30, 1985, Petitioner filed a second habeas petition setting forth identical claims, but omitting the improper jury claim. These cases were consolidated for hearing and are now before the Court for disposition.

## I. FACTS

Petitioner was convicted of aggravated robbery, along with co-defendant Jaster Lee Marbley, in a joint trial before a jury in the Circuit Court of Jefferson County, Arkansas, on February 24, 1983. Both were represented by the same attorney. Both were sentenced to life imprisonment.

The robbery resulting in Petitioner's conviction took place at the Flamingo Liquor Store on University Drive in Pine Bluff, Arkansas. It is undisputed that Petitioner was at the Flamingo Liquor Store at approximately 4:00 p.m. on December 15, 1982, just moments before the store was robbed. Petitioner states in his pleadings that he purchased wine and was leaving the store when he met Marbley in the doorway but that he took no part in the robbery. Virginia Noble, the store clerk on duty at the time of the robbery, corroborated this statement in her testimony:

Then Jaster came in as Jimmie was leaving out the door. Jimmie stood to the side as Jaster came in, and waited for a few minutes like he was waiting for Jaster to say something, but they never did make any communication together right at that time. So when Jimmie left out, I look off at the television and when I looked back around, well, this is when I looked in the barrel of this shotgun ... (T.111–112)

On cross examination of Ms. Noble, the following exchange took place concerning Petitioner's involvement in the robbery:

Q: Well, did he participate in the robbery?

A: No, he didn't. (T.122)

Ms. Noble's eye witness testimony was the only direct evidence presented at the trial. As the statements quoted above by Ms. Noble show, Petitioner was not implicated in the commission of the robbery by the direct evidence presented. The essence of the direct evidence is that Jaster Lee Marbley, the co-defendant, entered the liquor store as Petitioner was leaving; and that after Petitioner left, Marbley pointed a sawed-off shotgun at Ms. Noble and told her to give him the money in the cash register. (T.112) Ms. Noble testified that she knew Marbley from coming in the store regularly. (T.112) In fact, Ms. Noble testified that she knew both men, Petitioner and Marbley, from coming into the store "practically every day". (T.110) Ms. Noble testified that after she gave him the money, Marbley left the store, took off running toward the Mad Butcher (a gro-

cery store about one block south of the liquor store on the same street) and then detoured toward Lake Pine Bluff. (T.112) Then the following exchange took place:

Q: Now, this is Jaster Marbley that you are talking about that you saw headed in the Mad Butcher's direction?

A: Right.

Q: Jimmie Hudson, did you see where he was?

A: No, I didn't see him any more.

Q: You don't know where he was?

A: No. (T.114–115)

The evidence presented to show that Petitioner participated in the robbery was circumstantial. Virginia Noble, the store clerk, testified that Petitioner and Marbley had been in the store together to buy liquor earlier that day. (T.111) Cynthia Marbley, the co-defendant's niece, testified that she saw Petitioner at Marbley's apartment, where she also lived, with a sawed-off shotgun two or three days before the robbery. (T.161–162) Carl Leonard, the manager of the apartment complex where Marbley lived, testified that Petitioner and Marbley were together at Leonard's office between 10:00 a.m. and 11:00 a.m. on the day of the robbery and that Petitioner had "a couple of shotgun shells." (T.168–169) Leonard said Petitioner tried to sell the shotgun shells to him. (T.171) Leonard testified that he did not see Petitioner anymore that day; but that he did see Marbley in an intoxicated state around 5:00 p.m. at Ben Mar Apartments (where Marbley lived) shortly before the police came to arrest him. (T.169) Floyd Fuller, who lived on University Drive near the scene of the robbery, testified that Petitioner came to Fuller's house between 4:00 p.m. and 4:30 p.m. on the day of the robbery and that Petitioner had two shotgun shells. (T.199) Fuller also testified that the shells Petitioner had on the day of the robbery did not appear to be the same shells that the State introduced at trial. (T.199–200) Fuller testified that Petitioner played with Fuller's small child, who had started crying; that Petitioner then left to go to the liquor store to buy some liquor and took the baby with him. Petitioner was arrested shortly thereafter at the Flamingo Liquor Store, the scene of the robbery, with a baby in his arms. (T.193)

Cross-examination of Melvin Smith, one of the arresting officers, went, in part, as follows:

Q: You arrested Hudson there at the liquor store, didn't you?

A: Yes, sir, I did.

Q: The exact place that had been robbed apparently?

A: That's correct.

Q: And he was there holding a baby?

A: That's correct.

Q: He wasn't trying to get away, was he?

A: Not at that time.

Q: How long was this, supposedly, after they were supposed to have been robbed?

A: About ... approximately ... maybe an hour.

Q: About an hour?

A: Yes.

Q: And did she tell you that he had been in there and bought some whiskey that day and been around there?

A: That's correct.

Q: Did she tell you he participated in the robbery?

A: She didn't say whether or not he did or not. She said they was together and he left out before the other man pulled the gun. (T.193)

The most damaging testimony against Petitioner came from Robert Bullard, the owner of Bullard Cleaners, located about one block south of the Flamingo Liquor Store on University Drive, near the Mad Butcher grocery store. Mr. Bullard testified that Petitioner came into his shop before noon on the day of the robbery and gave Bullard's son a package containing a sawed-off shotgun. (T.180) Bullard said that Petitioner came back to his shop with Marbley about 4:00 p.m. that day, picked up the package containing the gun, and that the two men left and took the gun with them. Bullard testified that the two

men headed north and that the Flamingo Liquor Store was one block north of his cleaning shop. Bullard testified that Petitioner came back to his shop alone about 15 minutes later and asked him to keep the gun. (T.183) Bullard stated that he told Petitioner that he would not have allowed Petitioner to leave the gun at the shop that morning if he (Bullard) "had of been here". (T.183) On cross examination, Bullard stated: "I didn't take it. My boy took it in. I was back there working." The weapon used in committing the robbery was not introduced into evidence.

The Petitioner took the stand and testified in his own behalf. Petitioner testified that he had no involvement in the robbery. Petitioner stated that he was in the store to buy wine around 4:00 p.m.; that he left and met a man named William Hart about a half block from the liquor store. From there, Petitioner went to the Mad Butcher lot and to the Varsity Club. (T.247) On cross examination, Petitioner admitted making a similar statement to the police earlier that also listed a man named Glen Delph as a person he encountered after leaving the liquor store. (T.255-256) Petitioner denied telling the police that he had seen a man fitting Marbley's description enter the store as he was leaving. (T.255) Petitioner testified that he then went to Floyd Fuller's house, finding two shotgun shells on the way (T.243), and from there back to the liquor store where he was arrested. (T.245) Petitioner also testified that he did not know that Bullard was going to testify against him. (T.249) The State made a point of the fact that Bullard was a surprise witness during closing arguments:

> You know he almost threw them off the track. And the only person, if it wasn't for Robert Bullard, and he wasn't counting on that today because when Mr. Bullard walked in the courtroom this morning, the look on his face changed. If it wasn't for Robert Bullard's testimony, we couldn't hit him with that accomplice liability. (T.276)

The record reflects that Petitioner's counsel was sent a letter to the effect that Robert Bullard would testify on February 22, 1983, two days before Petitioner's trial. The letter does not relate the substance of Bullard's expected testimony. There is no evidence that Petitioner's counsel received the letter before trial or was informed about the testimony that Bullard would give. Petitioner's court-appointed counsel did not object to the State's use of Bullard as a witness; nor did he object to the substance of the testimony, even though a portion of Bullard's testimony was arguably hearsay.

Central to the resolution of this case are issues concerning the testimony of Robert Bullard and the lack of testimony of alibi witnesses. While this will be discussed in depth below, the testimony and arguments given at trial concerning these issues are relevant to a recitation of the material facts now before the Court. Petitioner was cross-examined concerning the absence of alibi witnesses to corroborate his testimony and earlier statements to the police about his activities during the time of the robbery. However, it appears that Petitioner did not understand the meaning of the term alibi witness. "But ... I didn't give no alibi witnesses ... The police officer asked me who it was that I seen that day, and I told him who I saw." (T.256)

The Petitioner's testimony that he was at the Mad Butcher lot and the Varsity Club with Glen Delph is contradictory to the Bullard testimony that he was at the cleaning shop trying to dispose of a weapon immediately after the robbery. Glen Delph was not called as a witness to corroborate Petitioner's alibi. Petitioner specifically testified that he did not have his lawyer subpoena Delph. (T.256)

Similarly, Petitioner's appointed counsel did not call Glen Delph or other alibi witnesses to rebut Bullard's testimony and corroborate the Petitioner's story. The testimony of the liquor store clerk, Virginia Noble, that Marbley left the store with the gun, headed toward the Mad Butcher and detoured running toward the lake, and her further statements that she did not see Petitioner at that time (T.114), is in accord with Petitioner's testimony of his actions

after he left the liquor store, the testimony that Delph may have given had he been called as an alibi witness, and the testimony that Glen Delph gave in fact when this Court conducted an evidentiary hearing in Petitioner's habeas action. This portion of Ms. Noble's testimony was highlighted by the State during closing arguments as conclusive evidence against Marbley. (T.263) The record is silent as to any evidence of Marbley returning the gun to Petitioner for disposal at Bullard's Cleaners.

Petitioner's appointed counsel represented both co-defendants throughout the trial. Counsel did not file a motion to sever and obtain separate trials. Counsel did not object to the Bullard testimony. Counsel did not call alibi witnesses on Petitioner's behalf. The record reflects that Petitioner and Marbley wrote a letter to the Court prior to the trial asking for a different attorney. (T.16) Counsel filed a no-merit brief when Petitioner and Marbley appealed their convictions.

In his *pro se* appeal brief, before the Arkansas Supreme Court, Petitioner argued that (1) there was insufficient evidence to convict him of aggravated robbery, (2) that Marbley should have been tried separately, (3) that an instruction on a lesser-included offense should have been given to the jury, and (4) that trial counsel was ineffective. In an unpublished opinion, *Hudson v. State*, No. CR 83–112 (Feb. 21, 1984) [Available on WESTLAW, 1984 WL 1898], the Arkansas Supreme Court affirmed Petitioner's conviction. The Court held (1) that the Bullard testimony provided sufficient circumstantial evidence to convict, (2) that a joint trial was not reversible error because no motion for severance was filed and that co-defendants did not attempt to incriminate each other, (3) that a lesser included offense was not warranted, and (4) that the ineffective counsel claims would not be considered because they were raised for the first time on appeal.

The Arkansas Supreme Court also denied Petitioner's claims in his Rule 37 post-conviction relief appeal. The Court held that Petitioner did not name the witnesses that defense counsel failed to call or the evidence to be shown through alibi testimony. The Court also held that any challenges to the testimony given by the State's witnesses were waived by the failure to object at trial, and that no prejudice was found on appeal by counsel's failure to move for separate trials. *Hudson v. State*, No. CR 83–112 (May 29, 1984).

## II. ISSUES

In the Petitioner's two habeas applications, now before the Court, he alleges that (1) his appointed trial counsel was ineffective, (2) the evidence presented at trial was insufficient for a finding of guilt, and (3) that the selection of his jury was improper because the panel did not represent a cross-section of the community. Because no facts were alleged in Petitioner's complaint in support of his improper jury allegation, and because no testimony was given on this issue at Petitioner's evidentiary hearing in the present action, the jury issue will not be considered.

The Respondent concedes that Petitioner has exhausted his State remedies. Therefore, the remaining issues presented by Petitioner as grounds for habeas relief are properly before this Court for determination on the merits.

■ Where insufficient evidence is alleged as a ground for habeas relief, the standard of review is whether any rational trier of fact would have found the defendant guilty beyond a reasonable doubt after viewing the evidence in the light most favorable to the prosecution. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Further, the holding of a state appellate court rejecting a challenge to the sufficiency of evidence in a criminal case is entitled to great deference by federal courts. *Wallace v. Lockhart*, 701 F.2d 719 (8th Cir.1983), cert. denied, 464 U.S. 934, 104 S.Ct. 340, 78 L.Ed.2d 308 (1983).

In view of the holdings in *Jackson* and *Wallace*, the Court finds that the Petitioner's claim based on insufficient evidence is without merit. Therefore, the only remaining issue is whether Petitioner's count-appointed trial counsel was ineffective and

whether Petitioner was prejudiced thereby, under the standards set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and related authority not overruled by the *Strickland* decision.

## III. EVIDENTIARY HEARING

On August 5, 1986, an evidentiary hearing was held before the undersigned. At the hearing, the Petitioner testified essentially the same as he did at trial. Petitioner admitted that he went to Bullard Cleaners on the morning of the day of the robbery, but denied any knowledge of, or participation in, the robbery.

Petitioner testified that he went to the Flamingo Liquor store about 4:00 p.m. Petitioner said he left the liquor store, meeting Marbley in the doorway, and then walked south down University Drive where he met Glen Delph on the Mad Butcher parking lot. Petitioner stated that he and Delph went across the street to the Varsity Club, which was across the street and drank a beer for about an hour. Petitioner stated that he left the Varsity Club and went to Floyd Fuller's house, finding two shotgun shells on the way. He then went back to the liquor store to buy beer for Fuller and himself, taking Fuller's small child with him, and was arrested while at the liquor store.

Glen Delph testified at the evidentiary hearing. Delph stated that he met Petitioner, who is Delph's cousin, on the Mad Butcher parking lot on December 15, 1982, the day of the robbery, after 3:00 p.m. but before dark; that he and Petitioner went to the Varsity Club and drank for over an hour. Delph stated on cross examination that he believed Petitioner was innocent, but that he did not come forward with the information because he did not think that the police would believe him. Delph stated that he was never contacted by a lawyer about Petitioner's case.

Petitioner also testified that his appointed trial counsel consulted with him one time, by conducting a short visit with him at the Jefferson County Jail. Petitioner said that counsel asked him if he wanted anyone subpoenaed, and that he told counsel to subpoena Glen Delph. Petitioner stated that counsel told him that wouldn't be necessary and that he acquiesced because he presumed counsel to know what was best, and because his previous request to have his appointed counsel relieved or substituted had been denied by the trial court.

Petitioner's appointed trial counsel testified at the evidentiary hearing. Counsel stated that he did not file a severance motion because it would have been frivolous. Counsel stated that he tried to work out a plea agreement but was unable to do so. Counsel testified that he didn't recall Petitioner asking that Glen Delph be subpoenaed as a witness, but that he would have been glad to do so since Petitioner said he was not guilty. Counsel said that his experience had been that alibi witnesses don't stand up to eye witnesses. Counsel testified that he investigated the case by reading the prosecution's file.

## IV. CUMULATIVE ERRORS

The Eighth Circuit's holding in *Harris v. Housewright,* 697 F.2d 202 (8th Cir.1982) is deemed to be controlling in this case. In *Harris,* the Court held that a petitioner claiming ineffective assistance of counsel must show that counsel failed to exercise the customary skill and diligence that a reasonably competent attorney would bring to bear under similar circumstances, and that prejudice resulted from counsel's ineffectiveness. The Magistrate finds both ineffectiveness of counsel and prejudice to be present in this case.

### A. *The Failure to Investigate.*

The investigation of Petitioner's case by his appointed counsel consisted primarily of one short visit with Petitioner in the Jefferson County Jail, a review of the prosecuting attorney's file, and a review of information submitted by the prosecutor pursuant to discovery motions.

■■■■ Failure to conduct an adequate investigation of a criminal defendant's case by his defense attorney constitutes ineffective counsel if there was a duty to investi-

gate and the defendant was prejudiced by the failure to investigate. *Fowler v. Parratt*, 682 F.2d 746 (8th Cir.1982). However, it is not necessary to prove that the defendant would have been acquitted in the absence of the ineffective assistance. *Thomas v. Wyrick*, 535 F.2d 407, 414 (8th Cir.), cert. denied, 429 U.S. 868, 97 S.Ct. 178, 50 L.Ed.2d 148 (1976). Under ordinary circumstances, a defense attorney must interview witnesses who have knowledge of the crime or who can provide an alibi. Cf. *Langston v. Wyrick*, 698 F.2d 926, 931 (8th Cir.1982). It is settled law that "failure to make a reasonable investigation may amount to ineffective assistance of counsel", *McQueen v. Swenson*, 498 F.2d 207, 217 (8th Cir.1974) (McQueen I); and that once petitioner shows the existence of admissible evidence, which could have been uncovered by reasonable investigation which would have proved helpful to the defendant either on cross examination or his case in chief, a new trial is warranted unless the Court is able to declare that the omission was harmless beyond a reasonable doubt. *Id.* at p. 220. See also *McQueen v. Swenson*, 560 F.2d 959 (8th Cir.1977) (McQueen II).

█ The testimony at the hearing shows that counsel's investigation of Petitioner's case consisted of no more than a brief visit with Petitioner at the county jail and a review of the prosecution's file. Counsel did not interview or call Glen Delph as an alibi witness at trial. Counsel testified that he did not remember Petitioner asking him to subpoena Glen Delph. However, Petitioner's statement to the police (T.25), taken on December 15, 1982, the day of the robbery, shows that Petitioner claimed to be in the company of Glen Delph at the same time that Bullard places him at the cleaning shop trying to dispose of a shotgun. Glen Delph's testimony at the hearing corroborated Petitioner's alibi, and would have been admissible evidence in Petitioner's favor if Delph had been called at trial. These facts, along with the paucity of other evidence against Petitioner, bring this case within the rule announced in *McQueen I* and *McQueen II*. See also *Wade v. Armontrout*, 798 F.2d 304 (8th Cir.1986).

B. *The Representation of Both Defendants.*

█ By Court orders of January 4, 1983 (appointing counsel to represent Marbley) and January 17, 1983 (appointing the same attorney to represent Hudson), trial counsel undertook to represent both Hudson and Marbley. The trial transcript demonstrates that such a decision was ill-advised. While Marbley was positively identified as the shotgun-wielding robber, Hudson was merely placed at the scene in the passive role of a customer who left the premises before the robbery commenced. Other evidence against Hudson was sparse. Nonetheless, trial counsel could not seek to shift all blame away from Hudson on the theory that Marbley acted alone, without running roughshod over his obligation to Marbley. While the joint representation of co-defendants is not a *per se* violation of the constitutional guarantee of effective assistance of counsel, it is to be regarded with great skepticism. See *Mann v. Britt*, 266 Ark. 100, 583 S.W.2d 21 (1979); *Chambers v. State*, 264 Ark. 279, 571 S.W.2d 79 (1978).

In *Mann*, supra, the Arkansas Supreme Court stated:

Mr. Callahan, primarily as defense counsel but also simply as a practicing attorney, was under *a clear-cut obligation to anticipate the possibility of a conflict* (emphasis supplied) between the interests of his several clients. We discussed the point to some extent in *Chambers v. State* (citation omitted): We have no doubt at all about Larry's having been entitled to independent counsel. The duty of a lawyer in Mr. Etoch's position is clearly stated in the ABA Standards Relating To The Defense Function, § 3.5(b) (1971):

Except for preliminary matters such as initial hearings or applications for bail, a lawyer or lawyers who are associated in practice should not undertake to defend more than one defendant in the same criminal case if the duty to one of the defendants may conflict with the duty to another. The potential for conflict of interest in representing multiple defendants is so grave that ordi-

narily a lawyer should decline to act for more than one of several co-defendants except in unusual situations when, after careful investigation, it is clear that no conflict is likely to develop and when the several defendants give an informed consent to such multiple representation.

*Mann,* supra, 583 S.W.2d at page 23.

Not only is counsel obligated to be sensitive to the possibility of a conflict of interests, the Magistrate in this instance determines that the trial court, too, should have undertaken the burden of avoiding the conflicts by providing additional counsel. The record reflects that a letter was sent to the trial judge on February 2, 1983 (twenty-two days before the trial) expressing dissatisfaction with appointed counsel and asking for another attorney. The letter was signed by both defendants; if any response was made, it was not preserved. *Cruyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) imposes upon the trial judge an obligation to explore the propriety of joint representation when the trial judge knows or might reasonably know that a conflict exists. See also *Hayes v. Lockhart,* 766 F.2d 1247 (8th Cir.1985). While the letter to the trial court from the defendants stopped short of citing an actual conflict of interests, it was sufficient to alert the court and to trigger the obligation to make an inquiry, which would in turn have revealed the obvious.

### C. *The Failure to File a Motion for Severance of Defendants.*

Trial counsel testified at the evidentiary hearing that he did not consider filing a motion for severance, and that in his opinion, such a motion would have been frivolous. The Magistrate does not agree. Severance motions as to multiple defend-

ants in Arkansas are governed by Rule 22.3(b)(i) of the Arkansas Rules of Criminal Procedure.[1] In *McDaniel v. State,* 278 Ark. 631, 648 S.W.2d 57 (1978), the Arkansas Supreme Court reversed and remanded the petitioner's conviction on the basis of the trial court's failure to grant a severance motion, and in so doing set forth seven factors that an Arkansas trial judge, in considering the totality of the circumstances, is to look upon as favoring severance:

1. Where defenses are antagonistic;
2. Where it is difficult to segregate the evidence;
3. Where there is a lack of substantial evidence implicating one defendant except for the accusation of the other defendant;
4. Where one defendant could have deprived the other of all peremptory challenges;
5. Where if one defendant chooses to testify the other is compelled to do so;
6. Where one defendant has no prior record and the other has;
7. Where circumstantial evidence against one defendant appears stronger than against the other.

A perusal of the above list with the facts of Petitioner's case in mind shows several of the listed factors to be present, yet the trial court was never given the opportunity to pass upon such a motion because of trial counsel's offhand determination that it would be "frivolous".[2]

### D. *Discovery and the Testimony of Robert Bullard.*

As mentioned earlier, the only significant evidence against the Petitioner was the testimony of Robert Bullard. Indeed, the prosecutor so declared in his closing

---

1. (b) The court, on application of the prosecuting attorney, or on application of the defendant other than under subsection (a), shall grant a severance of defendants:

   (i) if before trial it is deemed necessary to protect a defendant's right to a speedy trial, or it is deemed appropriate to promote a fair determination of the guilt or innocence of one (1) or more defendants.

2. Trial counsel's handling of this matter remains an enigma. Although a former prosecuting attorney and a veteran of many trials, he spent virtually no time in the investigation and preparation of the case, and offered as explanatory of his behavior his belief that there was nothing to be done because the defendants said that they were both innocent and "there are no witnesses to innocence." The defendants came to believe (as shown in their letter to the court at T.16) that counsel was not interested in their

argument. The existence of the witness Bullard was not revealed, however, until two days before the trial when the prosecutor filed a letter addressed to defense counsel disclosing that Bullard would testify. (T.35) There is no indication in the record that the letter was received, and counsel did not object to Bullard's testimony, though had he done so it would have been within the province of the trial court to exclude the testimony, or to grant a continuance. See Rule 19.7(a), Arkansas Rules of Criminal Procedure; cf. *United States v. Olson*, 697 F.2d 273 (8th Cir.1983). An examination of Bullard's testimony shows that it was inconsistent and was riddled with hearsay. Again, trial counsel failed to object and to preserve the questions for appellate review.

## V.  CONCLUSION

The petition for a writ of habeas corpus should be granted. The Respondent should have forty-five (45) days from the date of the District Court's Order within which to retry the Petitioner or release him from custody. Thereafter, the writ should issue.

cases because of the low fees paid to court-appointed attorneys. A reduced fee or the lack of one does not, of course, diminish in any way the duties owed to a client in an appointed case. See Rule 6.2, *Model Rules of Professional Conduct For Lawyers* (Ark.S.Ct. January 1, 1986).