**Francis Vern KELLOGG, Appellant,**

**v.**

**David SCURR, Warden, Appellee.**

**No. 83–2198.**

United States Court of Appeals, Eighth Circuit.

Submitted April 9, 1984.

Decided Aug. 27, 1984.

Rehearing Denied Oct. 4, 1984.

Kermit L. Dunahoo, Des Moines, Iowa, for appellant.

Thomas J. Miller, Atty. Gen. of Iowa, Thomas D. McGrane, Asst. Atty. Gen., Des Moines, Iowa, for appellee.

Before LAY, Chief Judge, McMILLIAN and JOHN R. GIBSON, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Francis Vern Kellogg appeals from the judgment of the district court[1] denying his petition for a writ of habeas corpus under 28 U.S.C. § 2254 (1982). Kellogg was convicted of second-degree murder in the death of his wife Constance. On appeal, he argues that he was denied effective assistance of counsel as guaranteed by the sixth and fourteenth amendments because his attorney failed to (1) introduce into evidence an alleged suicide note written by his wife; (2) call as a witness the physician who attended to his wife on the night of the shooting; and (3) move to suppress the weapon causing his wife's death. We affirm the denial of the writ.

On the evening of August 22, 1975, Francis and Constance Kellogg were quarreling in the bedroom of their home in Waterloo, Iowa. Constance was shot in the head with Kellogg's pistol and died later that evening. Kellogg has never admitted guilt, and his defense at trial was that his wife committed suicide or that her death was accidental. His conviction, which rested on circumstantial evidence because the two were alone when the shooting occurred, was affirmed on direct appeal. *State v. Kellogg,* 263 N.W.2d 539 (Iowa 1978). Kellogg then filed an application for post-conviction relief in Iowa state court. The petition was denied by the same judge who presided over the trial and the denial was affirmed on appeal. *Kellogg v. State,* 288 N.W.2d 561 (Iowa 1980). Kellogg then filed this petition for writ of habeas corpus in the United States District Court for the Southern District of Iowa.

**I.**

To succeed on a sixth amendment ineffective assistance of counsel claim, a defendant must show that his or her attorney failed to provide reasonably effective assistance which resulted in prejudice to the defense. *Strickland v. Washington,* — U.S. —, —, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Reasonably effective assistance may be defined as "the skill and diligence that a reasonably competent attorney would exercise under similar circumstances * * *." *Thomas v. Lockhart,* 738 F.2d 304, 307 (8th Cir.1984). Because "[t]here are countless ways to provide effective assistance in any given case,"

---

**1.** The Honorable Donald E. O'Brien, United States District Judge for the Southern District of Iowa.

*Strickland,* 104 S.Ct. at 2066, and to offset the "distorting effects of hindsight," *id.* at 2065, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *id.* at 2066. *See Wallace v. Lockhart,* 701 F.2d 719, 726 (8th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 340, 78 L.Ed.2d 308 (1983); *Comer v. Parratt,* 674 F.2d 734, 736 (8th Cir.), *cert. denied,* 459 U.S. 856, 103 S.Ct. 125, 74 L.Ed.2d 108 (1982). To establish that an attorney's inadequacy was also prejudicial, a defendant must show that there exists a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland,* 104 S.Ct. at 2068.

■ An ineffective assistance of counsel claim presents a mixed question of law and fact. *Eldridge v. Adkins,* 665 F.2d 228, 236 n. 5 (8th Cir.1981), *cert. denied,* 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 168 (1982). Therefore, the presumption of correctness accorded the factual determinations of the state court under 28 U.S.C. § 2254(d), and those of the district court under the clearly erroneous standard of Fed.R.Civ.P. 52(a), applies only to the historical facts underlying the attorney's performance but not to the ultimate conclusion as to whether or not effective assistance has been rendered. *Thomas,* 738 F.2d at 307 n. 3; *Strickland,* 104 S.Ct. at 2070. *Cf. Sumner v. Mata,* 455 U.S. 591, 597, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982).

**II.**

Kellogg first argues that his attorney, James Dunbar, was ineffective because he failed to introduce an alleged suicide note written by his wife. He contends that because his defense was that his wife died accidentally or by suicide, and the note was the only evidence corroborating the suicide theory, Dunbar's omission was both professionally unreasonable and prejudicial. Dunbar testified that he declined to use the note because (1) he estimated that it was written three to four years before Constance's death when she thought she was suffering from terminal cancer and (2) the note portrayed Kellogg as an unloving, uncaring husband, an image he did not want portrayed to the jury. Both state courts and the federal district court concluded that Dunbar's decision not to introduce the note was a tactical decision that was not professionally unreasonable.

The state courts made the following factual determinations in regard to the note. Dunbar was aware of the note prior to trial and had discussed the option of using it with Kellogg. It was found in one of the purses not then used by Constance and was "not unequivocally a 'suicide' note." The note contained matters which tended to put Kellogg in a bad light and the decision not to use it was a tactical one because the harmful effects of offering the note outweighed any possible benefits.[2]

■ The district court also observed, and we agree, that Dunbar's first reason for not introducing the note—that it was written three to four years earlier when Constance thought she had little time to live—was "somewhat implausible" since the note refers to her marriage to Kellogg which occurred only fourteen months before her death.[3] Were this Dunbar's sole reason, we would have a far different case than the one before us. However, his testimony reveals that he also decided against using the note for tactical reasons:

2. The Supreme Court of Iowa, on direct appeal, speculated that the "note was so plaintive and contained such profession of love for [Kellogg] that Mr. Dunbar may have regarded it as a boomerang." 263 N.W.2d at 544. This is not a factual determination presumed correct under section 2254(d) because the claim of ineffective assistance of counsel was not before the court.

3. Respondent argues that because the Kelloggs lived together for a number of years prior to marriage, Constance's use of the word "marriage" in the note may refer to when they began living together rather than a point in time following their formal "wedding." We cannot agree, as there is no evidence that Constance used these terms with anything but their ordinary meaning.

[T]he note revealed to me a portrayal of Kellogg as rather insensitive, perhaps unfaithful, non-loving, non-attentive husband, certainly a characterization that I did not want to have presented to this court.

\* \* \* \* \* \*

[I]n my professional judgment, it would have been a serious tactical mistake to allow that material to go to the jury.

\* \* \* \* \* \*

It's exactly the thing we're trying to prevent Kellogg as being portrayed as.

Kellogg argues that all decisions made by trial counsel are tactical in some sense and that "even tactics must stand the scrutiny of common sense \* \* \*." Appellant's Brief at 15. We agree that the label "trial strategy" does not automatically immunize an attorney's performance from sixth amendment challenges. In *Eldridge v. Atkins, supra*, we determined that counsel's so-called strategic decision not to call certain defense witnesses constituted ineffective assistance because the decision was less strategic than it was the result of inadequate preparation and investigation. As recently stated by the Supreme Court, however, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 104 S.Ct. at 2066. In this case, Dunbar discussed with Kellogg the option of using the note. He ultimately determined that the strongest way to present the suicide and accident defenses was to keep out any evidence of Kellogg's propensity or motive to commit violent acts against his wife. He concluded, and both state courts and the federal district court have agreed, that the note presented exactly this type of evidence. Moreover, Dunbar took other action consistent with this strategy. He made a motion in limine to exclude the testimony of some eleven witnesses prepared to attest to

Kellogg's temper, possible unfaithfulness and fits of violence against his wife and others. Dunbar's decision represents a reasoned and plausible trial strategy which was not the product of inadequate investigation or preparation.[4] To now hold that his choice was professionally unreasonable, a conclusion inevitably influenced by the jury's guilty verdict, would "give[ ] impetus to a form of second guessing which is possible in every case and does not comport with the constitutional standards which require defense counsel to exercise only that skill and diligence possessed by competent counsel under like or similar circumstances." *Knott v. Mabry*, 671 F.2d 1208, 1214 (8th Cir.1982).

### III.

 Kellogg next contends that Dunbar rendered ineffective assistance because he failed to present the testimony of Dr. Kyle, the physician attending to Constance in the emergency room on the night she was admitted. In the Admitting History and Examination, Dr. Kyle wrote as follows:

PRESENT SYMPTONS: In Coma from Self inflicted Gunshot Wd. of The head. Pt. has reportedly threatened to shoot herself previously and this time she did about 8 PM Aug 22, 1975 [.] Has been depressed about six wks (Hsb).

\* \* \* \* \* \*

IMPRESSION: Self Inflicted Gunshot wound of the head[.] Prognosis is very poor. Survival impossible[.]

In the Discharge Summary, Kyle stated: "Constance Kellogue [sic] shot herself in the brain about 8:00 p.m. on August 22nd. \* \* \* Impression: Self inflicted gunshot wound of the head."

Dunbar testified that he interviewed Dr. Kyle and a second physician attending to Constance that night. He stated that they recalled only that her death was inevitable, but no other "details of what transpired."

---

**4.** Dunbar's belief that the note was three to four years old does appear to be the product of inadequate investigation. This conclusion does not, however, vindicate Kellogg's claim, since it is on the basis of Dunbar's strategic reason for

not using the note, and not on his belief concerning the note's relevance, that we hold that Kellogg's sixth amendment rights were not violated.

On this basis, he decided against calling Kyle as a witness.

Dunbar's decision not to call Dr. Kyle, who admitted to no recollection of the events surrounding that night, was not unreasonable. *Maxwell v. Mabry*, 672 F.2d 683, 685–86 (8th Cir.1982). At the same time, we recognize that the failure to confront a forgetful witness with previous statements relating to the supposedly forgotten events may, under some circumstances, be a troubling omission. *Cf. Harris v. Housewright*, 697 F.2d 202, 209 (8th Cir.1982) (failure to impeach medical examiner's testimony with conflicting evidence in the autopsy report). The district court stated that Dunbar's "failure to call the coroner and confront him with his 'forgotten' written opinion has given this Court real concern * * *."[5] Nevertheless, it concluded that Kellogg had failed to meet his heavy burden to show that Dunbar's omission was a dereliction of his duty.

The district court expressed as the source of its concern the belief that the two medical reports represented Kyle's professional opinion that Constance Kellogg died of a self-inflicted gunshot wound. We are unable to say that the record supports this conclusion. First, there is no evidence that Dr. Kyle was the coroner; rather, the record shows that he was present in the hospital on another matter when Constance was admitted and was called to assist the emergency room doctor. Second, we are not convinced that the reports express Dr. Kyle's professional opinion as to the cause of death. We think it is as likely that he was expressing a speculative conclusion, probably based on information supplied to

him by Kellogg. This possibility is based on the notation "Hsb" which Kyle wrote in the Admitting History and Examination following his statement that Constance's injury was self-inflicted. Support for the possibility that Kyle was simply echoing Kellogg's explanation is also drawn from the statements that Constance previously threatened to shoot herself and that she had been depressed for six weeks, statements not based on medical diagnosis and most likely known, even if true, only to those close to her such as her husband.[6] There is no indication of any source other than Kellogg for this background information. In light of the reports' probative shortcomings, we need not decide if Dunbar's failure to call Kyle and confront him with the reports was professionally unreasonable: the omission was without prejudice because there is simply no reasonable probability that had Dunbar taken such action, the result reached at trial would have been different.[7]

### IV.

Kellogg's third and final argument is that he was denied effective assistance of counsel because Dunbar failed to file a motion to suppress the revolver used in the shooting. He asserts that it was seized illegally and that it was extremely prejudicial because none of Constance's fingerprints were found on the trigger or grip, a fact obviously inconsistent with a suicide defense. Dunbar testified that he did not move to suppress the revolver because having it in evidence was consistent with the accident and suicide defenses. He reasoned that it would show the jury that

5. The district court went on to conclude that [I]t would seem to have been a windfall to the defense to have called the doctor and confronted him with his written opinion even if he denied the writing, and if he did not deny it but attempted to water down the conclusion by saying that it was a preliminary conclusion that he no longer believed or something similar, the jury would have food for thought.

6. Due to the likelihood that Kellogg was the source of Dr. Kyle's diagnosis, it is also unlikely that the reports themselves could be admitted under the business records exception to the

hearsay rule. *See* Fed.R.Evid. 803(6); *Petrocelli v. Gallison*, 679 F.2d 286 (1st Cir.1982).

7. [A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. * * * If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.
*Strickland*, 104 S.Ct. at 2069–70.

Kellogg kept firearms in the house and that the revolver was not specially obtained by him in a deliberate effort to kill his wife. The state court's denial of Kellogg's petition was based not on this strategic reason, but because it found that the police were at the Kellogg residence with petitioner's tacit permission, and therefore items seized "would not seem * * * to be vulnerable to a motion to suppress." In the federal proceeding, Dunbar gave as a second reason for his decision not to file the motion his belief that, in a suicide defense, the jury expects to see the weapon and its absence might have led to unfavorable speculation. The district court denied habeas relief on the ground that this second reason was a reasonable trial strategy, and did not comment on the state court's conclusion that a suppression motion would probably not have succeeded.

█ Based on the record before us, we have considerable difficulty in concluding that Dunbar's tactical reasons for failing to file a suppression motion were professionally unreasonable. Even if we had stronger views in this respect, however, the omission was without prejudice to Kellogg's defense. The prejudice flowing from an attorney's failure to file a suppression motion is determined by examining the likely success of the motion. *United States v. Johnson,* 707 F.2d 317, 320 (8th Cir.1983); *Sallie v. North Carolina,* 587 F.2d 636 (4th Cir.1978), *cert. denied,* 441 U.S. 911, 99 S.Ct. 2009, 60 L.Ed.2d 383 (1979). We agree with the state court that the revolver could not have been suppressed, more specifically that it was clearly admissible under the plain view exception to the warrant requirement. This exception permits the warrantless seizure of items if the following three conditions are met:

> *First,* the police officer must lawfully make an "initial intrusion" or otherwise properly be in a position from which he can view a particular area. *Second,* the officer must discover incriminating evidence "inadvertently," which is to say, he may not "know in advance the location of [certain] evidence and intend to seize it," relying on the plain view doctrine only as a pretext. *Finally,* it must be "immediately apparent" to the police that the items they observe may be evidence of a crime, contraband, or otherwise subject to seizure.

*Texas v. Brown,* 460 S.Ct. 730, 103 S.Ct. 1535, 1540, 75 L.Ed.2d 502 (1983) (citations omitted) (emphasis added); *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (plurality opinion); *United States v. Sanders,* 631 F.2d 1309 (8th Cir.1980), *cert. denied,* 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981); *United States v. Wilson,* 524 F.2d 595 (8th Cir.1975), *cert. denied,* 424 U.S. 945, 96 S.Ct. 1415, 47 L.Ed.2d 351 (1976).

It is without dispute that the revolver was discovered inadvertently and that it was incriminating on its face. As for whether the intrusion was lawful, the record reveals that Officer Johnson was dispatched to the scene because of a report of a shooting victim at the Kellogg residence. The report originated from Kellogg's own call to the ambulance following the shooting. Johnson met Kellogg inside the house and asked him what happened. Kellogg said that "[my] wife * * * shot herself." Johnson asked where and Kellogg said "into the bedroom" and pointed toward the bedroom. Johnson entered the bedroom and noticed a shotgun against the wall and a revolver and a holster at the end of a bed. He then stationed himself outside the room and waited for police lab technicians to arrive. Officers Anton and Lattin soon arrived, took photographs and seized a number of items, including the revolver. It is quite clear that Kellogg consented to Johnson's presence in the bedroom. This is consistent with his explanation that his wife committed suicide and he had nothing to hide. On these facts, we conclude that the revolver was discovered in an area where the police were lawfully present. As all three elements of the plain view exception were thus satisfied, the revolver was clearly admissible and Dunbar's failure to file a suppression motion was without prejudice.

Kellogg argues that *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), requires that we conclude that the revolver was unlawfully seized. In *Mincey,* the Supreme Court held that a homicide was not an exigent circumstance that justified the police in conducting a warrantless search that lasted four days and involved the seizure of 200 to 300 items. *Mincey* is not controlling in the present case. First, *Mincey* was decided more than two years after Kellogg's trial, the point from which we must determine if the suppression motion would have had any chance of success.[8] At that time, "lower courts had rather consistently held to the contrary prior to *Mincey* * * *" that a so-called "murder scene" exception to the warrant requirement existed. 2 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment,* § 6.5(e) at 458 (1978). More importantly, we are not concerned about whether the shooting created an exigent circumstance sufficient to justify a warrantless search. No search was conducted in this case: the only issue presented was whether Johnson was lawfully in the bedroom for purposes of seizing evidence in plain view. Kellogg's consent establishes that Johnson's presence was lawful.[9]

### V.

We recognize that while no single error of an attorney may violate the sixth amendment, multiple errors viewed cumulatively may be constitutionally infirm. *Harris,* 697 F.2d at 206. We are satisfied in this case that no such cumulative effect is present and that Kellogg has failed to over-

come the presumption that Dunbar rendered effective assistance. The denial of the writ is affirmed.

---

8. The plain view exception was firmly established in 1976. *See Coolidge, supra; Wilson, supra; United States v. Williams,* 523 F.2d 64 (8th Cir.1975), *cert. denied,* 423 U.S. 1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976); *United States v. Johnson,* 506 F.2d 674 (8th Cir.1974), *cert. denied,* 421 U.S. 917, 95 S.Ct. 1579, 43 L.Ed.2d 784 (1975); *United States v. Story,* 463 F.2d 326 (8th Cir.), *cert. denied,* 409 U.S. 988, 93 S.Ct. 343, 34 L.Ed.2d 254 (1972); *Theriault v. United States,* 401 F.2d 79 (8th Cir.1968) (Blackmun, J.).

9. Both parties discuss in their briefs whether Constance's mother, Louise Hicks, who was on an extended visit with her daughter when the

shooting occurred, could validly furnish third-party consent to search the bedroom. Nowhere does the record reveal, however, that Mrs. Hicks was in any way involved with the seizure of the revolver. Her consent does appear to be relevant to the seizure of Constance's bed the following day when she was home and Kellogg was not. The police seized the bed because flecks of Constance's blood were discovered on the headboard. However, the legality of this seizure is not raised on appeal and, in any event, Dunbar's failure to move to suppress the headboard, even if it was illegally seized, was clearly without prejudice.