**Joe Allen KERN, Petitioner,**

v.

**Bill ARMONTROUT, Respondent.**

**No. 87–0256–CV–W–1.**

United States District Court,
W.D. Missouri, W.D.

June 15, 1987.

---

Joe Kern, pro se.

Donna Richards-Crosswhite, William Webster, Atty. Gen., State of Missouri, Jefferson City, Mo., for defendant.

## MEMORANDUM AND ORDER DENYING PETITION FOR FEDERAL HABEAS CORPUS

JOHN W. OLIVER, Senior District Judge.

### I.

The determination of this State prisoner ineffective assistance of counsel habeas corpus case is complicated by the failure of the State trial court to apply the controlling federal standard in determining the Sixth Amendment question presented in this case. Although that court cited the leading Missouri case of *Seales v. State*, 580 S.W.2d 733 (Mo.1979) (en banc), it nevertheless applied the "fair trial" standard that the Supreme Court of Missouri expressly rejected in that case as the ground upon which the Rule 27.26 motion was denied.

In like manner, the Missouri Court of Appeals, Western District, cited *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and other federal cases in which the applicable federal standard was articulated. The State appellate court denial of Rule 27.26 relief was, however, predicated in large part on the findings of fact made by the State trial court in its application of a "fair trial" standard.

Petitioner's petition for federal habeas corpus must nevertheless be denied for the reason that the petitioner has failed to carry the burden of proof imposed on him by applicable federal law. The evidence adduced at the Rule 27.26 evidentiary hearing, when considered in light of the transcript of the trial, establishes that the relevant factual circumstances were fully and fairly developed and that this case may properly be determined on the files and records presently before this Court without the necessity of conducting any further evidentiary hearings.

### II.

#### A.

Petitioner's *pro se* Rule 27.26 motion alleged in substance that the petitioner was denied effective assistance of trial counsel in that, prior to trial, the petitioner gave his trial counsel a list of defense witnesses whom he wanted to call at trial, that the witnesses on that list could have given testimony in support of petitioner's defense of self-defense, and that petitioner's trial counsel failed to contact the witnesses listed.

A first amended Rule 27.26 motion was filed by petitioner's appointed Rule 27.26 counsel. That amended motion alleged that the petitioner was represented at trial by Mr. J. Arnot Hill and Ms. Barbara Roberts-Day. The amended motion alleged generally that "movant and his counsel relied upon the defense of self-defense at trial; movant testified that the alleged victim, Kathleen ("Kitty") McClelland, pulled a gun on movant at a bar called the Chestnut Inn and told movant he wasn't going to leave the bar alive (Tr. 205); subsequently, a gun was given to movant in the restroom of the bar, movant testified at trial (Tr. 206); movant further testified at trial that after he was given a gun on the evening of the alleged offense he attempted to leave the bar by the only exit, i.e., the front door, at which time the alleged victim, Kathleen "Kitty" McClelland, began screaming at movant and reached down in her purse (Tr. 210); movant further testified at trial that he believed the alleged victim to be 'going for a pistol' so he pulled his own gun and shot her (*id.*)." *Id.* at 11.

Specifically, the amended motion alleged that "movant was denied effective assistance of counsel ... in that: ... trial counsel failed to attempt to locate and subpoena to trial Josie Brown, a witness to the shooting, who would have testified that he [sic] saw a pistol laying on top of or next to Kathleen McClelland after the shooting; movant, prior to trial, gave this information to his counsel;" and that "movant's trial counsel failed to attempt to locate and subpoena to trial Bobby Smith, Lois and Sara Tricarico, who witnessed said shooting and who observed a 'large caliber automatic laying by the body of the deceased· after the shooting....'" *Id.* at 11–12. The amended Rule 27.26 motion further alleged that "trial counsel failed to attempt to interview and subpoena Pete Genova, the owner of the Chestnut Inn, who would testify that prior to the shooting he observed Kathleen McClelland with a pistol; movant supplied this information to his trial counsel prior to his trial." *Id.* at 12.

### B.

Petitioner did not call all of the thirteen persons which he listed as potential witnesses in his *pro se* Rule 27.26 motion and in his amended Rule 27.26 motion to testify on his behalf at his Rule 27.26 evidentiary hearing. He did call six witnesses, namely, Robert Smith [listed as "Bobby Smith" in both motions], Josephine Brown Battaglia [listed as "Josie Brown" in both motions], Bill Haynes [listed only in petitioner's *pro se* motion], Nancy Snow [listed as "Nancy Dixon" only in petitioner's *pro se* motion], Carolyn Sue Hubbard [who was not listed in either motion], and Margaret Barlow [who was not listed in either motion]. Petitioner also testified at length on his own behalf at the Rule 27.26 hearing. Barbara Day, listed in petitioner's *pro se* motion, was called and testified at length on behalf of the State at the Rule 27.26 hearing.[1]

Although the State trial court made any number of irrelevant findings of fact, we find and conclude that it did reliably make a substantial number of relevant findings of fact in regard to the evidence adduced at the Rule 27.26 evidentiary hearing. We find and conclude that the State trial court reliably found in the part of its decision captioned "Summary of Proceedings", that (1) "Robert Smith testified that ... he was at the Chestnut Inn ... on the night of the homicide ... that he heard several shots. [That shortly] thereafter, he viewed the body of the victim and saw a large blue pistol nearby [and that] ... he never contacted the movant's lawyer, Mr. Hill, or his assistant, Ms. Day and that he never provided that information to the police department" (*id.* at 14); that (2) "Josephine Battaglia ... testified that ... prior to the shooting, Mrs. McClelland [the victim] was seated at her table and ... that she ob-

---

1. The record shows that J. Arnot Hill, petitioner's other trial counsel, also listed in petitioner's *pro se* motion, died during the time petitioner's conviction was pending on direct appeal. The record does not show why petitioner did not call S. Richard Beitling, Cliff Bishop, Artie Peterman, Gary Comptaon, all listed in petitioner's *pro se* motion, or Lois and Sara Tricarico and Pete Genova, who were listed in petitioner's amended Rule 27.26 motion, as witnesses on his behalf at the Rule 27.26 hearing.

served a small black pistol inside her purse ... [and that] she never provided that information to the police nor did she ever make any attempt to contact the movant's lawyer, Mr. Hill or his assistant, Ms. Day" (*id.* at 14–15); that (3) "Bill Haynes ... testified that he was in fact called to testify on behalf of the defense at the movant's trial" (*id.* at 15); that (4) "Nancy Snow ... testified that she was seated at the table with Josephine Battaglia when the victim opened her purse [and that] she also saw a small black handgun in that purse [and] ... that at the time of the incident she did not want to get involved and therefore did not provide any information to the police and did not attempt to locate the movant's attorney, Ms. [sic] Hill or his assistant, Ms. Day" (*id.* at 15–16); that (5) "Carolyn Hubbard testified that several weeks prior to the homicide, she viewed a gun in the possession of the victim and that the victim communicated threats against the movant ... that she did not want to get involved at the time [and] ... she moved shortly after the incident in an effort to avoid being called as a witness for the defense" (*id.* at 16); and that (6) "Margo Barlow testified that ... she was also at the Chestnut Inn on the night of the homicide ... that she heard shooting and as she attempted to leave the place she noticed a large caliber handgun laying next to the victim ... that she never provided that information to the police and that she never contacted the movant's attorney, Mr. Hill or his assistant, Ms. Day." (*Id.* at 16).

The State trial court's summary of petitioner's testimony and that of Barbara Day as stated in its "Summary of Proceedings", while not particularly inaccurate, was far from complete. We are able to find, however, that the State trial court did reliably find that the petitioner testified that "he did have contact [with] Mr. Hill and Ms. Day on a number of occasions ... that his defense in the case was self defense in that Ms. McClelland attempted to shoot him before he shot and killed Ms. McClelland ... that he gave a list of witnesses to Ms. Day that he requested be subpoenaed for trial

... that he could not remember the names of the people on that list ... [and] that in in his opinion Mr. Hill and Ms. Day were ineffective in their representation because they failed to locate certain witnesses for trial." (*Id.* at 16–17).

In a similar incomplete manner, the State trial court found that "Ms. Barbara Day ... testified on behalf of respondent ... that Mr. Hill was appointed to represent the movant in the trial of this cause in 1981 ... [that] Mr. Hill had participated as a criminal defense lawyer in well over 500 jury trials ... that Mr. Hill asked her to join him in the defense as an assistant in the preparation of the case ... that Mr. Hill had contact with the movant on a number of occasions before trial both in person and by telephone ... that she also had a number of conversations with the defendant both by telephone and in person ... that Mr. Hill hired an investigator for the purpose of locating witnesses which were provided to them by the movant ... that based upon the investigator's efforts, a number of witnesses were located ... that in spite of the investigative effort, a number of witnesses were not located ... that of the witnesses that were located, Mr. Hill made the decision as a part of his trial strategy not to call certain witnesses on the basis of poor credibility [and] that in her professional opinion, Mr. Hill provided effective assistance of counsel to the movant." *Id.* at 17–18.

### C.

◼ The State trial court applied the "fair trial" standard, a modified form of the "farce and mockery" rule, that was formerly articulated and followed by the courts of Missouri before the Supreme Court of Missouri rejected that standard in its landmark decision in *Seales v. State, supra.* For the State trial court made repeated references to the "fair trial" standard expressly rejected in *Seales. Id.* at 21, 23. It concluded as a matter of law that nothing done by Mr. Hill or Ms. Day deprived the petitioner "of his constitutional rights to a fair trial." [2] *Id.* at 23.

**2.** *Any doubt about the State trial court's applica-*

tion of the rejected "fair trial" standard is re-

In addition to the State trial court's improper application of a "fair trial" standard, it also purported to find as a "fact" that "Mr. Hill made a strategic decision not to call certain of those witnesses on the basis of credibility problems" and therefore concluded that under Missouri's earlier "fair trial" standard, "strategic decisions have been consistently upheld." *Id.* at 22.[3] We turn now to the decision of the Missouri Court of Appeals, Western District.

### III.

#### A.

The unpublished per curiam opinion of the Missouri Court of Appeals, Western District (Exhibit J) was cast in substantially the same mold as the State trial court's decision. As did the State trial court, the Missouri Court of Appeals cited *Strickland v. Washington, supra,* and *Seales v. State, supra.* That court, however, relied on the same "trial strategy" theory articulated by the State trial court to support its affirmance of the denial of postconviction relief.

■ The Missouri Court of Appeals stated its approval of the "trial strategy" rationale of the State trial court by concluding that the "[s]election of the witnesses to be called at trial is a matter of trial strategy and is left to the discretion of defense counsel," and that the "courts have de-clared that only in a rare exception will a strategic choice be declared unsound," citing the Missouri Court of Appeals' case of *Porter v. State,* 682 S.W.2d 16, 18 (Mo.Ct. App.1984).[4] Exhibit J at 6–7. After noting that the State trial court had "found the testimony of Brown, Barlow, Battaglia and Snow incredible" (*id.* at 8), the Missouri Court of Appeals concluded that the "trial court did not err by finding that the decision not to call these witnesses was a matter of sound trial strategy." *Id.*

In *Garton v. Swenson,* 417 F.Supp. 697, 698 n. 1 (W.D.Mo.1976), a case which the Supreme Court of Missouri cited with approval in *Seales, see* 580 S.W.2d 736, we observed that "application of the 'farce and mockery' rule in this, or, for that matter, in almost any other case, implicitly requires a denial of petitioner's Sixth Amendment ineffective assistance of counsel claim without further factual inquiry." Much the same thing may be said in regard to the indiscriminate articulation and placement of a "trial strategy" label on the challenged conduct or omission of defense counsel in a Sixth Amendment case. For the result-oriented imposition and utilization of a "trial strategy" label frequently reflects no more than the result that would have been produced by the application of the now universally abandoned "farce and mockery" rule.[5]

---

3. The record shows that counsel for the State was at least partially responsible for the State trial court's adoption of its "trial strategy" theory. When the State trial court doubted the need to grant petitioner's Rule 27.26 counsel leave to file a post-hearing brief on the ground that a defendant "is not entitled to perfect lawyers ... he is [only] entitled to a reasonable defense," (Tr. 184), counsel for the State argued that a failure to call available witnesses for the defense must be considered "at the very minimum" as a matter of "trial strategy." Tr. 185. The Attorney General presents a similar "trial strategy" argument in this Court. *See* Attorney General's Supp. Response at 7–9.

4. *Porter v. State* stated that the "cases have consistently held that selection of witnesses to be

solved by the fact that, except for its passing reference to *Seales v. State* as above noted, it cited and relied only on Missouri cases that were decided before the Supreme Court of Missouri expressly rejected that standard in *Seales v. State.*

called is a matter of trial strategy." 682 S.W.2d at 18. *Porter* cited three Missouri Court of Appeals cases to support its statement of the "trial strategy" rule: *Franklin v. State,* 655 S.W.2d 561 (Mo.Ct.App.1983); *Gentile v. State,* 637 S.W.2d 30 (Mo.Ct.App.1982); and *Brame v. State,* 597 S.W.2d 665 (Mo.Ct.App.1980).

A number of other Missouri Court of Appeals cases have stated and applied the Missouri "trial strategy" rule in ineffective assistance of counsel cases. *See, e.g., Decker v. State,* 623 S.W.2d 563, 565 (Mo.Ct.App.1981); *Wilhite v. State,* 614 S.W.2d 33, 35 (Mo.Ct.App.1981); and *Cook v. State,* 511 S.W.2d 819 (Mo.Ct.App.1974). *Cook* was based on *State v. Caffey,* 457 S.W.2d 657 (Mo.1970), which stated and applied the "farce and mockery" rule which the Supreme Court of Missouri abandoned in *Seales.*

5. Both the application of the now abandoned "farce and mockery" rule and the more recent development of the "trial strategy" rule permit ineffective assistance of counsel cases to be swept under the judicial rug without the neces-

We thus conclude that we cannot properly defer to the State trial and appellate courts' articulation and use of the "trial strategy" rule in this case. For we may not properly conclude that such use is a permissible application of the federal standards that must be applied in the determination of a Sixth Amendment ineffective assistance of counsel case under the controlling decisions of the Court of Appeals for the Eighth Circuit to which we now make reference.

### B.

The Court of Appeals for the Eighth Circuit has recognized that a determinative application of a State court "trial strategy" rule that avoids appropriate Sixth Amendment factual analysis is not a constitutionally permissible rule. Recognition of the constitutional validity of such a rule would imply that the failure of defense counsel to call defense witnesses whose testimony would establish an ironclad alibi for the defendant must be considered a matter of "trial strategy" and therefore within the unreviewable discretion of defense counsel.[6]

The Missouri Court of Appeals cited but did not apply the principles stated in the Eighth Circuit's recent opinion in *Eldridge v. Atkins*, 665 F.2d 228 (8th Cir.1981), cert. denied, 465 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 168 (1982). The *Eldridge* court noted that in "both the Missouri Supreme Court as well as in the federal district court, the rejection of petitioner's claims [of ineffective assistance of counsel] was based on the finding that trial counsel's failure to call certain witnesses was related to trial strategy."[7] 665 F.2d at 230. The

Court of Appeals reversed the Eastern District of Missouri and remanded the case with directions to the trial court to grant the writ of habeas corpus.

*Eldridge* discussed the "trial strategy" rule in footnote 5 of that case. 665 F.2d at 236. Chief Judge Lay there noted that the "state court as well as the federal district court found it was a matter of trial strategy not to call Coburn, Taylor, or Price to the stand." Chief Judge Lay further noted that the Supreme Court of Missouri had purported to recognize that defense "counsel has a duty to use witnesses named by a defendant who may assist in the defense" and that to "fulfill that duty counsel must make a reasonable attempt to investigate a material witness' knowledge." *Id.* at 237 n. 5. In stating the reason why habeas corpus should be granted, *Eldridge* held that:

> The state court did not inquire into the reasonableness of counsel's trial strategy. Counsel made no reasonable attempt at the time of trial to learn whether Taylor or Price really would refuse to testify to what they knew. His "strategy" not to use them was not so much trial strategy as it was an accommodation to his own inadequate trial preparation.

*Id.*

The *Eldridge* court, after making a detailed analysis of the factual circumstances relating to the reasonableness of defense counsel's conduct, concluded that it was required to find "as a matter of law that counsel failed to make proper use of witnesses named by the defendant who could have assisted in the defense." *Id.*

---

sary factual analysis required by the applicable federal standard. It is our view that the result-oriented application of either rule does not comply with the mandate of the Sixth Amendment.

**6.** *Garton v. Swenson, supra,* presented precisely such an alibi situation. If the "trial strategy" rule applied by the State trial and appellate courts in this case had been applied in *Garton,* petitioner's habeas corpus petition in that case would have been denied rather than granted.

**7.** The Supreme Court of Missouri in *Eldridge v. State,* 592 S.W.2d 738, 741 (Mo.1979) (en banc)

stated the Missouri "trial strategy" rule in substantially the same manner as the Missouri Court of Appeals stated that rule in this case: "If an attorney believes that the testimony of an alibi witness would not unqualifiedly support his client's position, it is a matter of trial strategy not to call him to the stand. *Jackson v. State,* 537 S.W.2d 211 (Mo.App.1976). An assertion against counsel's choice of trial strategy with respect to calling or not calling certain witnesses does not establish ineffective assistance of counsel."

The principles stated in *Eldridge* were most recently applied in *Kellogg v. Scurr*, 741 F.2d 1099 (8th Cir.1984). As was true in *Eldridge*, the *Kellogg* court noted that "[b]oth state courts and the federal district court concluded that Dunbar's decision not to introduce the note was a tactical decision that was not professionally unreasonable." 741 F.2d at 1101. The district court had denied the petition for habeas corpus. The petitioner accordingly argued on appeal that "all decisions made by trial counsel are tactical in some sense" and that the application of Iowa's "tactical decision" rule was constitutionally impermissible. *Id.* at 1102.

The *Kellogg* court, consistent with the rationale stated in *Eldridge*, concluded that "[w]e agree that the label 'trial strategy' does not automatically immunize an attorney's performance from sixth amendment challenges." *Id.* As was true in *Eldridge*, the *Kellogg* court was thus required to make a detailed analysis of the factual circumstances established by the record in that case to determine whether defense counsel's conduct was reasonable under applicable Sixth Amendment standards. Based on that factual analysis, rather than on Iowa's "tactical decision" rule, the Court of Appeals affirmed the district court's denial of habeas corpus. The Eighth Circuit's rejection of Missouri's "trial strategy" rule in *Eldridge* and Iowa's "trial tactic" rule in *Kellogg* is consistent with the rationale and standard articulated in *Strickland v. Washington, supra.*

### C.

*Strickland* noted that before its decision in that case the Court had not had an occasion squarely to decide whether the "reasonably effective assistance" standard that had at that time been recently adopted by all the federal courts of appeals was the proper federal standard to be applied by both State and federal courts in Sixth Amendment ineffective assistance cases. *Strickland* concluded in that regard that as "all the Federal Courts of Appeals have

now held, the proper standard for attorney performance is that of reasonably effective assistance." 466 U.S. at 687, 104 S.Ct. at 2064. Reasonableness under the factual circumstances of the particular case is the hallmark of the applicable federal standard.

For the Court made clear that "[w]hen a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of *reasonableness.*" *Id.* at 687–88, 104 S.Ct. at 2064 (emphasis added). The Court further added that in "any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was *reasonable considering all the circumstances*" (*id.*) and that "a court deciding an actual ineffectiveness claim must judge the *reasonableness* of counsel's challenged conduct *on the facts of the particular case,* viewed as of the time of counsel's conduct." *Id.* at 690, 104 S.Ct. at 2066 (emphasis added).

*Strickland* further stated that the standards it articulated "require no special amplification in order to define counsel's duty to investigate" (*id.* at 690, 1045 S.Ct. at 2066) for the reason that the Court recognized that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691, 104 S.Ct. at 2066.

The Court also made clear that "in a federal habeas challenge to a state criminal judgment, a state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court to the extent stated by 28 U.S.C. § 2254(d)." *Id.* at 698, 104 S.Ct. at 2070. It expressly quoted and approved the basic principle stated in *Townsend v. Sain,* 372 U.S. 293, 309 n. 6, 83 S.Ct. 745, 755 n. 6, 9 L.Ed.2d 770 (1963), that the question of ineffectiveness of counsel is not a question of " 'basic, primary, or historical fact' ".[8] *Id.*

---

**8.** Although Justice Marshall was the only Justice that neither joined the Court's opinion nor the

judgment in *Strickland,* it is of interest to note that Justice Brennan, concurring in part and

Because of the failure of the Eleventh Circuit to apply the proper standard, the Court was required to make its own detailed analysis of the record in that case. It did so, concluding that "the conduct of respondent's counsel ... cannot be found unreasonable," (*id.* at 698, 104 S.Ct. at 2070) and accordingly held that "the District Court properly declined to issue a writ of habeas corpus." *Id.* at 701, 104 S.Ct. at 2071.

Because the courts of Missouri applied a "trial strategy" rule rather than the applicable federal ineffective assistance standard, this Court is required to make an analysis of the record in accordance with the principles stated in *Strickland* and in the Eighth Circuit cases above cited. We do so in the next part of this memorandum opinion.

### IV.

### A.

■ The files and records now before the Court[9] establish that the problem of locating defense witnesses who would testify on petitioner's behalf surfaced early in this case. The record shows that Mr. Hill, who was deceased at the time of the Rule 27.26 hearing, was appointed to represent the defendant on May 22, 1981. On June 22, 1981 Mr. Hill filed an application for at least a two-week continuance from the case's initial trial setting as case number 9 for the week of June 29, 1981. That application stated that the "crimes charged ... took place in the presence of fifty or more

people and an extensive investigation must be made by defense counsel." Appl. for continuance filed June 22, 1981.

Shortly after the requested continuance had been granted, Mr. Hill, an experienced criminal lawyer,[10] wrote Judge Vardeman a letter dated June 26, 1981 in which he stated that:

As you probably know the above-referenced case involves a homicide which took place in a crowded nightclub, Genovas Chestnut Inn, and there are a great number of witnesses to be interviewed and it is a very difficult case to prepare for trial and the defense will involve quite a number of witnesses.

Due to the above set out facts I will need additional counsel to help me prepare this case for trial and will need assistance at the counsel table. I will appreciate your appointing Mrs. Barbara Roberts Day as co-counsel. Mrs. Day, for about two and a half years, was Judge Riederer's clerk and for several years has been general counsel for Oppenheimer Industries. I have discussed this matter with her and she is willing to act as appointed co-counsel in this case.

Ms. Day's fee request shows that she was appointed as co-counsel by Judge Vardeman in late June 1981. For that fee request shows that she reviewed the file on June 29, 1981, that she conferred with Mr. Hill on July 2, 1981, and that she had her first conference with the petitioner on July 6, 1981. That document also establishes that petitioner telephoned Ms. Day on July

dissenting in part, stated that "I am satisfied that the standards announced today will go far towards assisting lower federal courts and state courts in discharging their constitutional duty to ensure that every criminal defendant receives the effective assistance of counsel guaranteed by the Sixth Amendment." *Id.* at 706, 104 S.Ct. at 2074.

9. Through the courtesy of the Clerk of the Circuit Court of Jackson County, we were able to obtain copies of appointed defense counsels' requests for fees and expenses, copies of two applications for continuance, and a copy of a June 26, 1981 letter Mr. Hill wrote to Judge Vardeman. Reference to that documentary evidence was made at the Rule 27.26 hearing but was not presented to the Court by the Attorney General.

10. The State court's finding of fact that "Mr. June Hill was an experienced attorney who handled a number of criminal cases in the course of his career" (Exh. F at 19), is not a relevant finding of fact. *See Goodwin v. Swenson,* 287 F.Supp. 166, 183 n. 11 (W.D.Mo.1968). By the same token, the fact that Ms. Day had no prior criminal law trial experience is equally irrelevant. *See United States v. Cronic,* 466 U.S. 648, 665, 104 S.Ct. 2039, 2050, 80 L.Ed.2d 657 (1984).

The fact, however, that Mr. Hill recognized that he needed additional help to locate defense witnesses is relevant in regard to whether defense counsel acted reasonably under the circumstances of this case.

9 and July 12, 1981 "to discuss witnesses" and that on July 13, 1981 Ms. Day "called various witnesses suggested by police reports and client." Ms. Day's fee request further shows that she spent the entire day of July 28, 1981 compiling a "list of witnesses" and telephoning witnesses "for appointments."

There is no dispute that petitioner told Ms. Day the first time she contacted him that his defense was self-defense and that he shot Kathleen McClellan (hereinafter "Kitty", as the victim was most frequently referred to at the Rule 27.26 hearing) because "I was protecting my own life." Tr. 122.[11] Ms. Day testified that she knew from the time "I first got into the case [that] Mr. Kern's defense was self-defense."[12] Tr. 168. Nor is there any dispute that two witness lists were prepared before the trial of the case. There is some question, however, in regard to who prepared those lists. As noted, Ms. Day's fee request shows that she compiled the first list of witnesses on July 28, 1981. Petitioner, on the other hand, testified that he gave Barbara Day a list of witnesses "about two and one-half months before the trial." Tr. 126. Petitioner conceded that he could not "remember who all was on" his list. Tr. 127. He testified that he did know that Bobby Smith, Nancy Hixon and Josie Brown Battaglia were on the list. Tr. 127. In regard to Margaret Barlow, the petition-er testified "I don't know about Margaret; I don't remember." Tr. 127. Petitioner later testified that the name Carol Hubbard was on his first list together with a total of 26 names. Tr. 141. He conceded that he could not remember "every name" because "a lot of these people I didn't know personally." Tr. 141. Petitioner testified that he got the names he put on his list "from people that I did know."[13] Tr. 141.

There is some conflict in the testimony adduced on behalf of the petitioner in regard to how the petitioner got the names he testified that he put on his witness list. Petitioner testified that he called Bobby Smith during the summer petitioner was held in jail before the trial and that Bobby Smith told him that "him and some girl seen a pistol laying by Kitty's body after I left the bar." Tr. 130.

Bobby Smith, on the other hand, testified that he had only talked with the petitioner on one occasion before he saw him at the Rule 27.26 hearing. Tr. 21. Smith testified that he knew Mr. Kern just casually and that the only time he had ever talked with him was in the summer of 1984 when Smith was "on an outcount from another institution to play softball" against a team composed of inmates of the Jefferson City penitentiary. Tr. 22–23.[14]

Ms. Day testified that the names on the list that she had compiled had been given

**11.** All references to "Tr. ____" are to the transcript of the Rule 27.26 hearing unless otherwise indicated.

**12.** It was obvious from the outset that it would be a difficult task to maintain such a defense. For petitioner conceded that he left the bar immediately after he shot Kitty and that when he got up the next day he learned that "when the police got there, they didn't find no pistol" belonging to Kitty. Tr. 130. He further testified that when he heard that "I threw [my] pistol in the river and I hitchhiked out of town." Tr. 152. The record does not show when he was apprehended.

**13.** Petitioner testified that "I was counting on seeing that list that I gave her when I came back up here [to testify at the Rule 27.26 hearing]." Tr. 126. Petitioner gave similar testimony in regard to the second list of witnesses: "I was counting on seeing that list when I come back. I can't remember all the names . . . a lot of them people I didn't know personally." Tr. 150.

Neither the petitioner nor Ms. Day was able to refresh their respective recollections in regard to the names that were on either witness list. Both lists were placed in Ms. Day's files which eventually became a part of Mr. Hill's file. Mr. Hill's files were never located and were not available to either the State trial court or this Court.

**14.** Smith was serving a ten-year sentence for robbery, first degree, imposed January 3, 1983 in another Missouri correctional institution at the time he testified that he had his only talk with petitioner in the summer of 1984. Tr. 4. Smith testified that the petitioner "was doing time [in the Jefferson City penitentiary] and he was down at the ball field when we arrived." Tr. 23. Smith testified that it was after that single conversation with petitioner that he agreed to testify at the petitioner's Rule 27.26 hearing. Tr. 22.

her by the petitioner at various times. Tr. 157. She stated that petitioner would "call me on the phone and give me the names of witnesses and their telephone numbers." Tr. 176–77. Ms. Day further testified that:

A. Whenever the telephone numbers were given to me, I made various attempts [to call the telephone numbers given me]. Sometimes I got ahold of the witnesses. For instance, I even went to the jail at that time to visit one of the witnesses and, you know, I tried calling the people, maybe five, six, seven times.

Q. Okay. Did you take statements from anybody?

A. I took statements from those people I got to talk to.

Q. Do you remember who you talked to?

A. Specifically not off hand. I would have to look at the file.

Tr. 157–58.

As stated in footnote 13 above, the record is clear that Ms. Day gave her entire defense file to Mr. Hill (Tr. 166); that she did not know what happened to Mr. Hill's files after his death (Tr. 170); but that she was certain that the witness list she had compiled was "in June Hill's files somewhere." Tr. 177. The record reflects that no one has been able to locate Mr. Hill's files. Tr. 170.

In regard to whether she knew that the petitioner believed that Bobby Smith would be available as a defense witness, Ms. Day candidly testified as follows:

Q: [W]hen you ... first got involved in the case, did Mr. Hill or Mr. Kern give you the name of Bobby Smith?

A: Yes, sir.

. . . . .

Q: Would you quarrel with the fact that the information provided to you or Mr. Hill was that Bobby Smith would testify that he was at the Chestnut Inn that night that Kathleen McClellan was killed or do you have any recollection?

A: I believe that is true.

Tr. 166–67. Ms. Day further testified that although she could not directly testify that she had been specifically advised that Bobby Smith would testify that he saw a gun laying next to Kitty McClelland after she was shot, she did know that "there were various discussions about a gun being in the position or next to Kitty." Tr. 167. There can be no real question, however, that Ms. Day attempted to locate and to interview Bobby Smith as a potential defense witness.

Ms. Day testified with equal candor in regard to her knowledge of petitioner's claim in regard to the testimony that Josie Brown (Battaglia) and Nancy (Snow) Hixon would give, if those witnesses could be located:

Q: Do you recall whether or not Mr. Kern told either you or Mr. Hill that Josie Brown and Nancy Hixon would testify that prior to this shooting they had contact with Kitty McClellan and saw a gun in her purse?

A: Yes.

Q: He did say that?

A: I believe so, and I think he told that to me or I accumulated that information from somewhere....

Tr. 168–69.

It is also undisputed that in addition to Ms. Day's efforts to locate the witnesses given her by the petitioner, Mr. Hill employed a paralegal to assist counsel in their attempt to locate defense witnesses. Tr. 135, 160, 161.

The record establishes that a second list of witnesses was prepared in addition to the list that Ms. Day compiled on June 28, 1981. Again there is a conflict in regard to who prepared the second list. Petitioner testified that he prepared and gave Ms. Day another list of witnesses the Friday before the day of trial. (Tr. 128). That testimony, however, is contradicted by the documentary evidence in this case. The transcript of the trial establishes that the second list of witnesses was prepared by counsel pursuant to Missouri Rule 25.05. Page 152 of the trial transcript (Exh. A) shows that when the defense called an "unidentified witness" to the stand at trial, the

prosecuting attorney stated: "Your Honor, on Friday afternoon at 3:00, the defense submitted to me a list of 20 witnesses for the first time that I had ever seen it, that were going to testify in this trial."

The trial record then shows that the trial court stated: "Okay. Pull him off and you can put somebody else on" and that the unidentified witness stepped down from the witness stand. Tr. 152. The record further shows, however, that the "unidentified witness" was Dale Brake and that after the defense had called three other witnesses, he was permitted to testify at length.[15]

Ms. Day's fee request also shows that she rather than the petitioner prepared the second list of witnesses on Thursday, September 3, 1981. That fee request shows under the date of "9/3/81" that Ms. Day had a "conference with Mr. Haynes, prepared final list of witnesses."[16]

On August 13, 1981 Mr. Hill filed an application for another continuance. That application noted that the case had been reset after the earlier continuance for trial as case number 4 for the week of August 17, 1981 and stated that "although counsel and co-counsel have shown due diligence they have been unable to locate and interview all witnesses suggested to them by defendant and therefore have been unable to furnish the Prosecuting Attorney with the names and statements of the witnesses as required by Supreme Court Rule 25.05, nor can they be ready for trial during the week of August 17, 1981."[17]   Appl. for continuance filed August 13, 1981.   Judge

Vardeman granted the requested continuance and the case was set for trial to commence September 8, 1981. The trial commenced on that date.

There is no question, of course, that there were a number of witnesses that Ms. Day testified that "we couldn't find, even the investigator could not locate." Tr. 172. It is clear, however, that Ms. Day's personal efforts to locate witnesses whose names had been given her by the petitioner extended to her spending a full eight-hour day on Labor Day, 1981, the day before the trial commenced, in a final effort to locate witnesses. Tr. 175.

B.

The record in this case does not leave much doubt about why defense counsel were unable to locate the witnesses who testified on petitioner's behalf at the Rule 27.26 hearing. It was not because defense counsel did not make a reasonable effort to locate those witnesses. The record establishes that those witnesses simply did not want to become involved in petitioner's case and that they did not want to be located. Experience establishes that it is more than difficult, if not virtually impossible, for counsel to locate a witness who does not want to become involved and who does not want to be found.

Bobby Smith's testimony establishes, for example, that he knew before petitioner's trial that the petitioner had been charged with the murder of Kitty and that his testi-

---

15. Mr. Brake, a friend of petitioner who had two convictions for burglary and a conviction for forgery (Exhibit A at 197), testified that he had known Kitty for 15 years, that she at one time had been married to his wife's brother, that she usually carried a gun, that she had a general reputation for violence, and that "as a matter of fact, she stabbed me on one occasion." Exhibit A, 194–96.

16. Bill Haynes was not an unlocated witness; he testified for the petitioner both at trial and at the Rule 27.26 hearing. Tr. 59–68. Haynes' Rule 27.26 testimony that he did not learn that Ms. Day was one of petitioner's lawyers until "several weeks before his trial" and that the "only contact I can recall any conversation I had with her was the morning of his trial," (Tr. 61), is contradicted by Ms. Day's fee request.

That document shows that Ms. Day had a conference with Haynes on July 27, 1981; that she had a telephone conference with him on August 17, 1981 in regard to a "witness"; and that she had a further "conference with Mr. Haynes" on September 3, 1981, the day she "prepared final list of witnesses."

17. Missouri Rule 25.05(A)(2) provides in part that "on written request by the state, the defendant shall disclose to counsel for the state ... (2) The names and last known addresses of persons, other than defendant, whom defendant intends to call as witnesses at any hearing or at the trial." As a matter of practice that rule requires the listing of the witnesses that a defendant *may* call rather than those that the defendant *will* call.

mony that he saw a gun laying beside Kitty would be helpful to the petitioner. Tr. 9, 16. Smith testified that he never told either the police or petitioner's counsel about what he had witnessed "because I didn't want to get involved." Tr. 16. Smith explained that "I wanted to stay out of it because I have had my own problems with the law." Tr. 9.

The record is clear that although Smith actually knew that Ms. Day was representing the petitioner, he made no real effort to get in touch with her. He testified that "a partner of mine" who knew the petitioner and who "heard I had been in the bar that night" gave him Ms. Day's telephone number. Tr. 17. Smith then testified that he called Ms. Day at least three times but that he was never able to reach her because he was always advised that Ms. Day "is out of the office; she is in trial; she is somewhere." Tr. 20. He further testified that he left a number where he could be reached but "[n]obody contacted me [so] I figured they didn't need me." Tr. 9.

Smith identified his "partner" as "Mike Steele." Tr. 17. Ms. Day's fee request establishes that she had a "telephone conference with Mike Steel" on August 17, 1981. It is reasonable to assume that "Mike Steele" and "Mike Steel" were one and the same person and that Bobby Smith's "partner" would have impressed him with the importance of getting in immediate contact with Ms. Day. It is also reasonable to assume that Smith merely went through the motions of getting in touch with Ms. Day because, to use his words, "I didn't want to get involved in this thing." Tr. 16.

The record establishes essentially the same factual circumstances in regard to Josie Brown Battaglia and Nancy Hixon, the two Rule 27.26 witnesses who testified that they saw a gun in Kitty's purse before she was shot. Josie Brown Battaglia testi-

fied that she thought she "wrote [the petitioner] a letter and asked him who his lawyer was because . . . me and Nancy . . . had talked . . . to see if we could help in his case." Tr. 53. She further testified that she knew that petitioner's lawyer tried to contact her at her father's telephone number and that she knew the "lawyer was looking for me." (Tr. 53–54). She, like Smith, testified that "I tried to call [the lawyer] one time but I never talked to nobody." The record is clear that Josie made no further effort to find out who that lawyer was or to try to contact them.[18] Tr. 54.

Although Nancy Hixon considered herself a pretty close friend of the petitioner and she would want to help him out if she could (Tr. 80), she, like Josie, testified that she did not tell the police that she saw Kathleen McClelland with a gun for the reason that "I didn't want to get involved." Tr. 78. Nancy Hixon confirmed the fact that "Josie had called me one time and asked me if I would go to Court [for] Joe." Tr. 78. Nancy testified that Josie had asked her in that single conversation whether she was willing to testify about having seen the gun in Kitty's purse. Tr. 90.

Although Nancy conceded that she fully understood that her testimony would be important (Tr. 81) and that it might be very helpful to the attorneys who were defending the petitioner (Tr. 82), she testified that she never tried to contact the attorney and that she never made an effort to tell Ms. Day that she had some information. Tr. 89.

It is quite obvious that Nancy must have known that Ms. Day was trying to locate defense witnesses who would testify on petitioner's behalf. For she testified that she knew that the petitioner had "called Josie" (Tr. 89) and that the petitioner had "asked her if we would come and be a

---

**18.** Josie Brown Battaglia further testified that when the police asked her immediately after the shooting "Did you see anything?", she told them "no." Tr. 38. She further testified as follows:

Q: Now, at the time you said no, were you thinking about having seen the gun in Kitty's purse?

A: Yeah, we seen it, we didn't want to get involved. We just wanted to stay out of it and get out of there, you know.

Tr. 38.

witness for him." Tr. 79. The petitioner confirmed the fact that he had telephoned Josie "now and then" during the summer before his trial and that Josie told him that "her and Nancy had seen the pistol, and that they was going to come down and testify." Tr. 131.

It is clear, however, that neither Josie nor Nancy actually intended to get involved and that Nancy did not even go through the motions of trying to get in touch with petitioner's counsel. She testified that Josie had told her "she would get back with me" but that she never heard anything more from Josie (Tr. 79) and that she did not do anything further under the circumstances. Tr. 89. Nancy, like Josie, testified that she simply "didn't want to get involved." Tr. 78.

Margaret Barlow was not listed as a witness in either petitioner's *pro se* Rule 27.26 motion or in the amended Rule 27.26 motion filed by his appointed Rule 27.26 counsel. She, however, like all the petitioner's Rule 27.26 witnesses, testified that "I didn't want to be involved because of my problems." Tr. 115. Indeed, Margaret Barlow testified that even the petitioner could not "get ahold of me"; she had actually moved her residence "three or four times" after the incident because she did not want anyone to find her. Tr. 111–12. She candidly testified that she didn't try to contact the petitioner's attorney and that "I didn't do nothing" because "I didn't want to be found; I didn't want to be involved in it." [19] Tr. 116.

Carolyn Sue Hubbard was another witness who testified at the Rule 27.26 hearing that was not listed in either of petitioner's Rule 27.26 motions. Apart from the question of whether her Rule 27.26 testimony, which concerned her seeing a machine gun in the trunk of Kitty's car in January 1981 outside Ban's Tavern and Kitty's threat to kill petitioner at that time, might not have been admitted in evidence at trial, it is clear that Carolyn never reported that incident to the police and that she didn't try to call the petitioner's attorney. Tr. 103. She excused her refusal to do so on the ground that she was afraid that Kitty "might have shot me." Tr. 103. Regardless of Carolyn's reason, it is apparent that she, like the other witnesses that testified on petitioner's behalf at the Rule 27.26 hearing, did not want to become involved as a defense witness at petitioner's trial.

## V.

The Court concluded in *Strickland v. Washington* that it was able to apply the "general standards for judging ineffectiveness claims" it articulated "to the facts of this case" for the reason that the "record makes it possible to do so." 466 U.S. at 698, 104 S.Ct. at 2070. The same thing is true of the record in this case.[20]

*Strickland* teaches that State and federal courts must recognize in their application of the controlling federal standard that a "convicted defendant's [ineffective assistance] claim ... has two components." 466 U.S. at 687, 104 S.Ct. at 2064. The first is that "the defendant must show that counsel's performance was deficient." *Id.* The second component is that "the defendant must show that the deficient performance prejudiced the defense." *Id.*

That case made clear that in order to establish the first component, "the defendant must show that counsel's representation fell below an objective standard of reasonableness" and that "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688, 104 S.Ct. at 2065.

---

**19.** There can be no real question that Margaret Barlow understood that defense counsel were trying to locate her. For she testified that "I heard that they needed the people that were there that seen what happened to come forth and all this but at the time I was, I was, you know, I didn't want to be involved in it." Tr. 116.

**20.** The relevant findings of fact made by this Court in no way conflict with the findings of fact made by the State courts. This Court was required to make those findings of relevant fact for the reason that the State court's limited findings of fact were made pursuant to its application of a "trial strategy" rule rather than in accordance with the applicable federal standard articulated in *Strickland*.

*Strickland* concluded that the "proper measure of attorney performance remains simply reasonableness under prevailing professional norms" and that the "[p]revailing norms of practice as reflected in American Bar Association standards and the like, *e.g.*, ABA Standards for Criminal Justice 4–1.1 to 4–8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable, but they are only guides."[21] *Id.*

In addition, *Strickland* teaches that:

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *Cf. Engle v. Isaac*, 456 U.S. 107, 133–134 [102 S.Ct. 1558, 1574–1575, 71 L.Ed.2d 783] (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

466 U.S. at 689, 104 S.Ct. at 2065.

■ The *Strickland* court, of course, recognized that defense "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.*

at 691, 104 S.Ct. at 2066. Thus if the record in a State prisoner habeas corpus case fails to establish that defense counsel did not make a "reasonable investigation," further inquiry into the second component of prejudice need not be undertaken by the federal habeas corpus court.[22]

While there was a "double failure" in *Strickland,* it is only necessary that we make a finding in regard to the first component of petitioner's ineffective assistance claim, namely, whether the petitioner has established that counsels' performance was deficient. We find and conclude that the petitioner failed to make a showing that the petitioner's counsel failed to make a reasonable investigation, either to locate the witnesses that testified on petitioner's behalf at the Rule 27.26 hearing or to locate any other witnesses whose testimony may have been beneficial to petitioner at the trial. We further find and conclude that the record in this case establishes that petitioner's investigation was, in fact, reasonable under the particular circumstances of this case and that the fact that defense counsels' reasonable investigation may not have located petitioner's Rule 27.26 witnesses was due primarily to the fact that those witnesses did not want to be located or to become in any way involved as defense witnesses at petitioner's trial.[23]

Accordingly, an order will be entered denying the pending petition for habeas corpus. For the reasons stated, it is

**21.** The commentary to ABA Standard 4–4.1 of The Defense Function relating to the duty to investigate states in part that "Facts form the basis of effective representation ... Considerable ingenuity may be required to locate persons who observed the criminal act charged or who have information concerning it.... Failure to make adequate pretrial investigation and preparation may be grounds for finding ineffective assistance of counsel."

**22.** The Court further made clear that "there is no reason for a court deciding an ineffective assistance claim ... to address both components of the inquiry if the defendant makes an insufficient showing on one" (*id.* at 697, 104 S.Ct. at 2069) and that "[f]ailure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id.* at 700, 104 S.Ct. at 2071.

**23.** We need not, and therefore do not reach the second component of whether defense counsels' performance may have "prejudiced the defense." For we have concluded that petitioner failed to establish that defense counsels' performance was, in fact, "deficient." We are satisfied, however, that the State trial court's view that petitioner's Rule 27.26 witnesses were "lying" when they testified that they saw a pistol (Tr. 185), was not an available ground for that court's denial of postconviction relief under the applicable federal standard. If it had been determined that petitioner was entitled to a new trial, the credibility of those witnesses could only be determined by another jury, rather than by the postconviction judge.

ORDERED (1) that the pending petition for habeas corpus should be and the same is hereby denied. It is further

ORDERED (2) that the Clerk, in accordance with Rule 58 of the Federal Rules of Civil Procedure, prepare and enter a final judgment on a separate document that reflects the denial of petitioner's petition for habeas corpus as stated in Order (1) above.